In re WISCONSIN STEEL COMPANY, a Delaware corporation, et al., Debtors.

WSC CORP. and all of the other debtors in possession

v.

INTERNATIONAL HARVESTER COMPANY, et al.

Bankruptcy Nos. 80 B 03766–80 B 03773. Adv. No. 81 A 442.

United States District Court, N.D. Illinois, E.D.

March 6, 1985.

ors in possession, without the knowledge of Harvester.

## BACKGROUND

For approximately 75 years prior to 1977, International Harvester Company owned and operated a steel mill on the south side of Chicago known as the Wisconsin Steel Works, along with a railroad, coal mines, iron mines and an ore carrying vessel on the Great Lakes. The purpose of these operations was to furnish steel to International Harvester for use in its manufacturing plants. The various operations were known collectively as the Wisconsin Steel Division of International Harvester.

In July 1977, Harvester sold the Wisconsin Steel Division to Envirodyne Industries, Inc. in a complicated transaction whereby the assets of the Division were transferred to a number of subsidiaries of a holding company organized by Envirodyne for that purpose. The sales price was $65 million, with $15 million paid to Harvester at the time of closing and the balance to be paid over time. Promissory notes for the balance of the purchase price were secured by the assets of the Division. As part of the transaction, the buyer assumed the liabilities of the Division, including an unfunded liability of approximately $86 million in pension benefits for Wisconsin Steel Division employees.

Allan Sweig, Nachman, Munitz & Sweig, Chicago, Ill., for Wisconsin Steel and all debtors in possession.

George Newton, Kirkland & Ellis, Chicago, Ill., for International Harvester, et al.

## MEMORANDUM OPINION

GRADY, District Judge.

This case is before the court on an appeal by International Harvester Company ("Harvester") from an order of Bankruptcy Judge Charles B. McCormick denying Harvester's motion to disqualify him and counsel for the debtors in possession from further participation in this proceeding. The basis for the disqualification and other relief sought by Harvester is that two judicial opinions in the case purporting to have been written by Judge McCormick were in fact written by the attorneys for the debt-

Not long after the sale, the purchasers (who, for convenience, are referred to in these proceedings as "WSC") encountered financial difficulty in making the required payments to Harvester and satisfying their other creditors, including several banks which had extended substantial loans. On March 31, 1980, WSC shut down its operations and filed for reorganization under Chapter 11 of the Bankruptcy Act, 11 U.S.C. § 1101 *et seq.* The bankruptcy petition was filed on behalf of the debtor by the law firm of Nachman, Munitz & Sweig, whose employment as attorneys for the debtor was approved by Judge McCormick on April 3, 1980. No trustee was appointed for the estate, and WSC was permitted to

operate the business as debtor in possession.

International Harvester filed a proof of claim against the bankrupt estate, alleging secured claims totalling $146,627,830.00.

WSC filed a counterclaim against Harvester, alleging fraud in the sale of Wisconsin Steel to Envirodyne. The counterclaim alleges that Harvester knowingly made false representations concerning the value of the assets and the earning potential of Wisconsin Steel and that Harvester has failed to live up to various commitments it made in connection with the sale. The counterclaim charges that the sale was basically a fraudulent scheme by Harvester, its Board of Directors, and one of its senior vice presidents to unload an unprofitable operation and defeat the claims of creditors. WSC asks that the claims of Harvester be subordinated to the claims of all other creditors and that various assets of Wisconsin Steel which have been retaken by Harvester be returned to the bankrupt estate.

Harvester made a motion to dismiss the counterclaim for failure to state a claim on which relief could be granted. The parties briefed the motion before Judge McCormick and the matter was taken under advisement. On November 18, 1982, Judge McCormick filed an 11-page opinion denying the motion to dismiss. The opinion paraphrases in detail the allegations of the counterclaim, discusses and quotes from a number of authorities and concludes that if the allegations are proved WSC will be entitled to all of the relief it seeks against Harvester and the individual defendants.

Discovery began in the adversary proceeding between WSC and Harvester, and in May 1983 WSC made a demand for all written communications between Harvester and its attorneys concerning the sale of the Wisconsin Steel Division. Harvester objected that these documents were protected by the attorney-client privilege, and the question was briefed before Judge McCor-

mick. WSC contended that the communications were made in connection with a fraud and were therefore not protected by the privilege. Harvester denied that any fraud had occurred, and the issue became whether there was such *prima facie* proof of fraud as to warrant penetration of the privilege. In August 1983, WSC submitted a 15-volume appendix of deposition transcripts and other materials to support its contention that a *prima facie* showing of fraud had been made.

On January 7, 1985, Judge McCormick issued an 11-page opinion in which he found that WSC had made a *prima facie* showing of fraud and ordered that the attorney-client communications be delivered to WSC within 15 days. The opinion stated that "the Court has reviewed all of the evidence submitted by WSC in support of its motion to compel production of documents and is satisfied that such evidence establishes prima facie proof of the following facts: ...," and then recited substantially verbatim the same paraphrase of the counterclaims' allegations that had been contained in the November 1982 opinion denying the motion to dismiss. There was no mention of any particular document or testimony and no reference to any material in the 15-volume appendix.

The opinion was signed and dated January 7, 1985, in Judge McCormick's own hand.

## THE MOTION TO DISQUALIFY

On January 9, 1985, at 9:30 a.m. the deposition of James C. Cotting was being taken by Mr. George D. Newton, Jr., one of the attorneys for Harvester, and Ms. Leslie Vercoe, an associate with the firm of Nachman, Munitz & Sweig.[1] Ms. Vercoe stated (on the transcript) that Judge McCormick's discovery order of January 7 had been "received in our office yesterday," January 8. Mr. Newton remarked that he had not received a copy of the order and asked Ms. Vercoe to send him one by messenger. She agreed to do so, and later that day Mr.

---

1. This recitation of facts is taken from the uncontradicted affidavit of George D. Newton filed in support of the motion to disqualify. There is no dispute that these events occurred, and in fact most of them are memorialized in court reporter transcripts and correspondence.

Newton received a copy of the order by messenger along with a letter from Ms. Vercoe stating, "Our office received a copy of this order on January 8, 1985, via mail." Later on January 9, Mr. Newton appeared before Judge McCormick at a status call on the case, and at that time there was a colloquoy between Mr. Newton, Judge McCormick, Ms. Karen Gebbia and Mr. Allan Sweig of the Nachman, Munitz & Sweig firm concerning the fact that Nachman, Munitz & Sweig had received a copy of the January 7 order and no one else had. Judge McCormick's minute clerk stated that the order had been mailed the evening of January 8 (Judge McCormick's secretary had informed Mr. Newton earlier that day that the order had been mailed on January 7). Mr. Sweig stated that his office had received the order the morning of January 8 and Ms. Gebbia said that it was on her desk at 1:00 p.m. on January 8 when she had returned from court. The focus of the discussion was how Nachman, Munitz & Sweig could have received an opinion through the mail the same day it had been mailed.

On January 11, Mr. Newton received a letter from Mr. Sweig stating that upon checking further with Judge McCormick's law clerk and secretary he learned that the statement made by the minute clerk the previous day was in error and that the order had been mailed on January 7 rather than on January 8.

Mr. Newton and other members of his firm, Kirkland & Ellis, then began examining various pleadings and orders in the court file and decided to consult an examiner of questioned documents. They retained Mr. Donald Doud, who concluded on the basis of water marks and typewriting analysis that Judge McCormick's opinions of November 18, 1982, denying the motion to dismiss and January 7, 1985, ordering document production were typed by the same word processors and on the same paper stock as were used to prepare pleadings filed by the Nachman firm. Counsel for Harvester then prepared a motion to disqualify Judge McCormick and the Nachman firm, supported by affidavits of Mr.

Newton and Mr. Doud. The motion was presented to Judge McCormick on January 22, 1985, and after a short hearing, he denied it. Mr. Newton began the hearing by informing Judge McCormick of the results of the document examination and Harvester's conclusion that there had been "... an inappropriate ex parte communication between your Honor and Mr. Sweig." Judge McCormick replied that he did not recall the circumstances of the November 1982 order, but that in regard to the January 7, 1985, order he had:

> ... felt it likely that my ruling would be that—it would be that International Harvester was not entitled to the privilege that it sought. And at that point I asked Mr. Sweig to present a proposed order. The order came over here and it sat here while my law clerk went over it, while I went over it, while my law clerk and I went through it again, the pleadings, the memoranda that was filed; and I frankly had a great deal of difficulty with the question and with the decision. And finally, I felt that the proposed order reflected what my ruling was, and I signed it.
>
> I have nothing—I see nothing wrong with that as far as I am concerned. My law clerk is in court here and he can tell you that that order came over here. I would guess that I had that order probably four or five months; maybe longer than four or five months. And I frankly had a little difficulty with the case because I think I understand the seriousness of the privilege between the attorney/client privilege that you were seeking.

Transcript of Proceeding before Judge Charles B. McCormick, Jan. 22, 1985 ("McCormick Transcript"), pp. 3–4. Judge McCormick remarked at later points in the hearing:

> Well, this is nothing unusual—you may very well not approve of, perhaps, my approach to my work load, but there is nothing unusual about this in this case, because I frequently ask the lawyers to submit proposed orders after I examine

whatever side before me that I have under advisement. I will have to say this, that it's infrequent that I accept orders without my own amendments or changes to better comply to my findings.

McCormick Transcript, p. 5.

The same thing would happen probably if I had found—if I decided that it appeared that I was going to rule for Harvester, I probably would have asked your office to submit a proposed order. We are operating here two judges short, and I have to find every way I can to have whoever help me or assist me in trying to keep up with the work load around here. I don't have time to sit down and draft orders; I have you lawyers help me along these lines.

McCormick Transcript, p. 6.

I don't regard it as improper. As a matter of fact, I think it's a procedure that's followed from time to time, not only in this court, but probably in most every other court.

McCormick Transcript, pp. 7–8. Judge McCormick stated that if Harvester was "suggesting that I or some member of my staff deliberately delivered a copy to opposing counsel or sent it to him beforehand, then I think that's reprehensible. It just wasn't done, in my judgment." McCormick Transcript, p. 7.

Mr. Newton moved that Judge McCormick enter an order impounding the court file and the office equipment and supplies in Judge McCormick's chambers and in the Nachman office for the purpose of allowing further document examination. Judge McCormick denied that request, stating that he thought it was "... out of line. I think it's reprehensible." McCormick Transcript, p. 8.

The concluding note of the hearing was Judge McCormick's statement that "As far as I am concerned, everything was properly done here; ..." McCormick Transcript, p. 9.

Harvester then took an immediate appeal to this court, and a hearing was held later that afternoon. Counsel and I reviewed the transcript of the hearing before Judge McCormick and then Mr. Sweig commented as follows:

Your Honor, I have very little to add, other than that Judge McCormick requested in both cases a proposed order long before the decision was rendered.

Ultimately he signed the orders. If he signed them in the form that I submitted to him, then I certainly acknowledge that they were prepared in my office.

I can only state to your Honor, and I'm prepared to submit to any type of discovery with respect to this matter, I can only state to your Honor that there have been no ex parte communications whatsoever between me or my office and Judge McCormick on this matter, at all.

We did respond to the request from his law clerk or his minute clerk, whichever the case may have been, in connection with those two situations, and possibly others, your Honor, that I don't recall right now.

But it has been Judge McCormick's practice, to my knowledge, for I think almost as long as I have been in practice in the bankruptcy area, and other judges who have requested from time to time that we submit, or that litigants, not only our office, but litigants submit proposed orders to them for their consideration.

In these cases, your Honor, Judge McCormick sat on those orders or had them in his possession for long periods of time before he ultimately entered them.

And as the Judge said with respect to the most recent order, he reviewed it, his law clerk reviewed it, he reviewed it with his law clerk; it was a period, your Honor, of approximately six or seven months between the time I submitted an order for his consideration and he entered any order.

I was satisfied, your Honor, that it was his order that he was entering.

Certainly, your Honor—and I can only state to your Honor that I had no reason whatsoever to advise Mr. Newton that I had received a copy of the order of January 7th at any time prior to the time that

I actually received it or otherwise, if I wanted to conceal anything.

We have never attempted to conceal this, your Honor.

Certainly, your Honor, with respect to the ultimate relief which Harvester seeks, I think it would be totally inappropriate, particularly, your Honor, would it be inappropriate to deny the creditors of these estates the opportunity of [having] their claims against Harvester and other defendants litigated before a court of competent jurisdiction so that those claims may be heard and determined.

We certainly, your Honor, do not believe that there has been any violation whatsoever, and certainly nothing which would—you know should cause the disqualification of counsel or the disqualification of the Judge.

There's been no attempt to—there's no ex parte communications.

Transcript of Proceedings before Judge John F. Grady, Jan. 22, 1985, pp. 6–8.

Part of Harvester's motion was that the adversary proceeding be dismissed and that the Nachman firm be ordered to reimburse Harvester for its fees and expenses and to return to the bankrupt estate all fees it had been paid in connection with the adversary proceeding. To obtain additional evidence in support of that relief, Harvester desired to conduct discovery concerning the full extent of the relationship between the Nachman firm and Judge McCormick's orders and opinions in the case. In that connection, the following colloquoy occurred:

MR. SWEIG: Your Honor, I can only say that the nature of the communications, namely that Judge McCormick's law clerk or minute clerk would call our office from time to time and ask us, in maybe two cases, maybe three cases, maybe four cases in this situation, and from time to time over the years in other cases—I acknowledge it—Judge McCormick's law clerk or minute clerk from time to time in litigation matters would call us and ask us to submit a proposed order.

THE COURT: Have you ever told opposing counsel about that?

MR. SWEIG: No, we have not, your Honor.

It was not suggested that we do that.

I only assumed, your Honor, that Judge McCormick, when we lost, Judge McCormick may have done, followed the same practice.

THE COURT: You never felt any sense of impropriety?

MR. SWEIG: Well, I can't say that, your Honor.

I felt that I was obligated to abide by the judge's request.

*Id.,* at pp. 12–13.

Following the hearing of January 22, the firm of Nachman, Munitz & Sweig and Allan Sweig obtained counsel to represent them in opposition to Harvester's motion to disqualify and for other relief. Both parties have filed briefs and Judge McCormick has himself filed a response to the Harvester motions.

## THE OPPOSING CONTENTIONS

 The Nachman firm and Mr. Sweig ("Sweig")[2] urge as a threshold matter that this court should decline jurisdiction of the appeal. The argument is that Judge McCormick's order is not "final" within the meaning of 28 U.S.C. § 158(a), which provides that district courts "shall have juris-

---

2. The record does not disclose who in the Nachman firm, other than Mr. Sweig, had anything to do with the writing of Judge McCormick's opinions or who in the firm other than Mr. Sweig knew anything about it. Although Mr. Sweig indicated at the hearing of January 22 that he was "prepared to submit to any type of discovery with respect to this matter," that attitude quickly changed when the Nachman firm retained its own counsel. The first thing counsel for the Nachman firm did was move to stay discovery pending determination of the appeal from Judge McCormick's order of January 22 denying disqualification *and other relief. I* granted that motion, because counsel's point that the appeal should be decided on the record as it existed at the time of Judge McCormick's order seemed well taken. Thus, there has been no further development of the facts concerning the identities of any persons at the Nachman firm in addition to Mr. Sweig who may have participated in the conduct at issue.

diction to hear appeals from final judgments, orders and decrees, and, with leave of court, from interlocutory orders and decrees, of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under § 157 of this title." Conceding that the district court has discretion to allow an interlocutory appeal, Sweig argues that the circumstances here do not justify an exercise of that discretion. Simply put, Sweig contends that nothing improper occurred and that there is no reason even to consider disturbing Judge McCormick's order denying disqualification. For reasons that will appear in the course of this opinion, I believe the interest of justice requires a review of Judge McCormick's order. Therefore, leave to appeal from that order is allowed.

Sweig's argument on the merits is based largely on the response Judge McCormick has filed in this court. Judge McCormick's position is that the Sweig firm did not prepare opinions for him; rather, at his request, they prepared *proposed* opinions. (The emphasis is Judge McCormick's) He states that he did not simply sign the opinions presented by Sweig but instead examined them critically and decided to adopt them only after he was satisfied that they fully comported with his own views, independently reached. As evidence that he had already decided to deny the motion to dismiss before receiving the proposed opinion from Sweig, Judge McCormick has attached to his response a draft opinion prepared by his law clerk. That opinion, by an analysis markedly different from that contained in the Sweig opinion, does in fact reach the conclusion that the motion to dismiss should be denied. Also attached to Judge McCormick's response is a marked-up copy of the Sweig January 7, 1985, opinion, indicating that Judge McCormick had experimented with various changes before finally deciding to file the opinion exactly as written by Sweig. The markings on this draft are cryptic, and it is not easy to visualize what the opinion would have looked like had Judge McCormick made any changes in it.

Sweig's position is that because "Judge McCormick has plainly stated that he made his decisions on the two motions after all litigants had a full opportunity to present their views and before seeking a draft opinion from the Sweig firm," [3] there has been no impropriety and no prejudice to Harvester. As far as a possible appearance of impropriety is concerned, Sweig argues that there is no such appearance here, since the facts, as revealed by Judge McCormick, show that there was no impropriety.

Harvester argues that Sweig and Judge McCormick have violated various specific canons of professional ethics. Canon 3A(4) of the Code of Judicial Conduct, applicable to all federal judges, provides that:

A judge should accord to every person who is legally interested in a proceeding, or his lawyer, full right to be heard according to law, and, except as authorized by law, neither initiate or consider *ex parte* or other communications concerning a pending or impending proceeding. A judge, however, may obtain the advice of a disinterested expert on the law applicable to a proceeding before him if he gives notice to the parties of the person consulted and the substance of the advice, and affords the parties reasonable opportunity to respond.

Bankruptcy Rule 9003 provides:

Except as otherwise permitted by applicable law, any party in interest and any attorney, accountant, or employee of a party in interest shall refrain from ex parte meetings and communications with the bankruptcy judge concerning matters affecting a particular case or proceeding.

Disciplinary Rule 7–110(b) of the Illinois Code of Professional Responsibility provides:

In an adversary proceeding, a lawyer shall not communicate, or cause another to communicate, as to the merits of the

---

**3.** Memorandum of Nachman, Munitz·& Sweig and Allan Sweig in Opposition to Application for Leave to Appeal and in Opposition to Motion to Disqualify and for Other Relief, p. 9.

cause with a judge or an official before whom the proceeding is pending, except

 (1) in the course of official proceedings in the cause;

 (2) in writing if he promptly delivers a copy of the writing to opposing counsel or to the adverse party if he is not represented by a lawyer;

 (3) orally upon adequate notice to opposing counsel or to the adverse party if he is not represented by a lawyer; or

 (4) as otherwise authorized by law.

Ethical Consideration 7–35 of the Illinois Code of Professional Responsibility states:

EC 7–35 All litigants and lawyers should have access to tribunals on an equal basis. Generally, in adversary proceedings a lawyer should not communicate with a judge relative to a matter pending before, or which is to be brought before, a tribunal over which he presides in circumstances which might have the effect or give the appearance of granting undue advantage to one party. For example, a lawyer should not communicate with a tribunal by a writing unless a copy thereof is promptly delivered to opposing counsel or to the adverse party if he is not represented by a lawyer. Ordinarily, an oral communication by a lawyer with a judge or hearing officer should be made only upon adequate notice to opposing counsel, or, if there is none, to the opposing party. A lawyer should not condone or lend himself to private importunities by another with a judge or hearing officer on behalf of himself or his client.

The application of these tenets to the case at hand is all too obvious. Each of them was violated by the communications between Judge McCormick and the Sweig firm and the writing of Judge McCormick's opinions by the Sweig firm without the knowledge of Harvester.

Dealing first with the principal defense—that Judge McCormick had already made up his mind and Sweig served merely as scrivener—there is no way anyone other than Judge McCormick, not even Sweig, can know whether that is true. Only Judge McCormick knows whether his mind was influenced in any degree by exposure to the Sweig opinion. While his submission to this court would indicate that he had made up his mind before receiving the opinion, the comments he made in the hearing of January 22, 1985, indicate just the opposite. He stated at that time that he read and reread the Sweig opinion, discussed it with his law clerk, found the question very difficult and only after months of consideration decided to adopt the opinion as his own.

It misses the point altogether to argue that the Sweig submission was merely a *proposal*. Of course it was a proposal. I would not expect Judge McCormick to commit himself in advance to sign and file the opinion exactly as submitted; it may have been unacceptable in whole or in part. That Judge McCormick might have changed a word here and there, or deleted certain paragraphs, as the exhibit to his response indicates he considered doing, does not change the fact that Judge McCormick in requesting the opinion, and Sweig in submitting it, were engaging in an *ex parte* communication concerning the merits of the case. Indeed, it is difficult to imagine a communication that concerns the merits of the case in a way more plenary than the writing of a judge's opinion. The lawyer has not merely suggested how the judge should rule but has prepared the ruling itself.

The vice of *ex parte* communication is well illustrated by this case. It is rarely possible to prove to the satisfaction of the party excluded from the communication that nothing prejudicial occurred. The protestations of the participants that the communication was entirely innocent may be true, but they have no way of showing it except by their own self-serving declarations. This is why the prohibition is not against "prejudicial" *ex parte* communications, but against *ex parte* communications.

Taking at face value what Judge McCormick said in the hearing of January 22, 1985, it seems likely that Harvester was

prejudiced by the Sweig opinion on the discovery issue. Judge McCormick read and reread that opinion while in the process of making up his mind whether to order the discovery or not. The opinion was, in effect, an additional brief by Sweig. "A lawyer may not properly give a memorandum to the trial judge without a copy to the other side, even where the court asked for it." Drinker, *Legal Ethics*, p. 78 (Columb. Univ.Press, 4th Printing, 1963). Had Harvester been given a similar opportunity to present a proposed opinion for Judge McCormick to study while making up his mind, possibly he would have decided the other way. But whether he would have or not, it is clear that each side should be given the same opportunity to persuade. "All litigants and lawyers should have access to tribunals on an equal basis." EC 7–35, *supra*.

Even if the opinions submitted by Sweig had not influenced the way Judge McCormick ruled on the motions, there is a strong appearance of impropriety in what was done. The judge had a communication with one side on the merits of the case without the other side knowing about it. Both Judge McCormick and Mr. Sweig seem to think that the "communication" in question was the message from Judge McCormick to Sweig that Sweig should prepare an opinion. It is not clear how this message was conveyed, but Judge McCormick and Sweig both suggest rather vaguely that it was by way of Judge McCormick's law clerk to some unnamed lawyer in the Sweig firm. It is apparently on this basis—that the message was not directly between the two of them and that it was a simple request rather than a discussion—that Judge McCormick and Sweig both deny that any *ex parte* communication took place. But the *ex parte* communication was not simply the request to prepare an opinion; it was the opinion itself, which was an expression of one side's views as to how the judge should rule on the pending motion.

A factor which adds to the appearance of impropriety is the failure of Sweig and Judge McCormick to make known the authorship of the January 7 opinion when it became clear that counsel for Harvester were puzzled and disturbed by the fact that Sweig had a copy before they did. Whatever the facts are concerning how Sweig had a copy of the signed opinion on January 8, or perhaps on January 7,[4] the real point here is not that he had a copy a day or two before the attorneys for Harvester did. That was important only because it aroused the suspicions of Harvester's counsel and prompted them to investigate further. The real point is that Sweig did not simply have a copy a day or two before opposing counsel;[5] he had a copy months before opposing counsel because that is when it was written, and he or someone

---

**4.** Another version of how Sweig obtained an advance copy of the opinion has now been offered by Judge McCormick in the response he filed with this court:

> I am further advised by my secretary and law clerk that they have the recollection that a young attorney whose name they cannot at this time recall but whom they associate with the office of Nachman, Munitz and Sweig came to the secretarial area during the morning of January 8, 1985 for the purpose of filing documents in an unrelated case. While in the office he noticed the original order of January 7, 1985 on a work table waiting to be sent to the clerk's office for docketing. A copy of the order was also on the table and counsel asked if the order had been signed and, if so, whether he could take a copy back to his office. He was advised that the order had been signed and a copy was mailed but he left with the copy.

Reply to International Harvester Company's Motion to Disqualify and for Other Relief ("Reply"), p. 6.

**5.** Judge McCormick was wide of the mark when he said that if Harvester was "suggesting that I or some member of my staff deliberately delivered a copy to opposing counsel or sent it to him beforehand, then I think that's reprehensible. It just wasn't done, in my judgment." McCormick Transcript, p. 7. It wasn't that Judge McCormick sent a copy to Sweig beforehand; it was that Sweig sent the opinion to *Judge McCormick* beforehand. If Judge McCormick thought it was "reprehensible" for Harvester to suggest that he deliberately sent Sweig an advance copy of the opinion, then obviously he believes that would amount to a charge of serious misconduct on his part. It is difficult to understand, then, why Judge McCormick sees no impropriety in what actually occurred.

else in his office wrote it. If Harvester's counsel were agitated about a difference of a day or two in delivery of the opinion, as they obviously were, then it must have been apparent to Judge McCormick and Sweig that counsel would have been interested, to say the least, in knowing the authorship of the opinion. Yet, no information was volunteered.

The failure of Sweig and Judge McCormick to disclose who wrote the January 7 opinion until after they were confronted with the questioned document examination is unfortunate. But if it was deceptive, it was no more so than Sweig's preparation of Judge McCormick's opinions in the first place. Quite aside from the question of *ex parte* communications, Sweig's authorship of these opinions makes them something other than what they purport to be, and that is the most troubling aspect of the case. Judge McCormick's opinions of November 18, 1982, and January 7, 1985, gave every appearance of being his own work, the product of his own independent analysis of the facts and the legal problems presented. That was undoubtedly the exact impression Judge McCormick intended Harvester to have, and Harvester had every right to rely upon the implied representation that these opinions were Judge McCormick's own work. It simply would not occur to anyone to think otherwise.[6]

Every experienced lawyer and judge knows how important it is that litigants believe in the fairness of the process. No one likes to lose, but if an unfavorable decision is perceived to be the result of an impartial consideration, it is usually beara-ble. What cannot be tolerated is an unfavorable decision that is seen as not simply wrong, but unfair.

When a judge issues an opinion, it is tangible evidence of the consideration that went into the decision. It provides assurance that an impartial third party analyzed the problem and independently came to a conclusion about the merits of the dispute. But the two opinions in question were not the work of a neutral arbiter. They were the work of Harvester's adversary, the very antithesis of what they purported to be.

There is nothing about the opinions of November 18, 1982, and January 7, 1985, that reflects any independent analysis by Judge McCormick, once their authorship is known. In the opinion of January 7, 1985, for instance, there is no indication that Judge McCormick actually looked at any *evidence* in reaching a determination that there was *prima facie* proof of fraud. While he has stated in the hearing of January 22 and again in his response filed in this court that he read the briefs of the parties and discussed the issues with his law clerk, he has not said that he read the 15 volumes of transcripts and other documents presented in support of WSC's motion. The opinion itself simply states in conclusory terms that there is *prima facie* evidence to support the allegations of the counterclaim. Paraphrasing those allegations adds nothing to the conclusory statement.

It is apparently true that Judge McCormick tentatively decided to grant WSC's

---

6. On January 18, 1985, Nachman, Munitz & Sweig filed a brief in this court, signed by Allan Sweig, opposing Harvester's motion to consolidate the adversary proceeding with two civil cases pending here which involve the Wisconsin Steel Division's unfunded pension liabilities. The brief argued that:

... The bankruptcy court is intimately familiar with the Adversary Proceeding, having issued two critical decisions and orders, namely:

A. The order dated November 18, 1982, denying defendants' motion to dismiss for failure to state a cause of action (a copy of which is attached hereto as Exhibit A); and

B. The order dated January 7, 1985, compelling production by IH of its communications with its attorneys (a copy of which is attached hereto as Exhibit B).

Judicial economy would not be served by withdrawing the trial of the complex Adversary Proceeding from the bankruptcy court and imposing upon this Court the burden of familiarizing itself with the Adversary Proceeding.

Opposition of WSC Corp. and All of the Other Debtors in Possession to Motion for Consolidation, p. 3.

motion, for otherwise he would not have asked Sweig to prepare an opinion. There were, after all, only two possible alternatives—to grant the motion or to deny it. To make a tentative choice of one of two alternatives can hardly be called decisive. Yet, it appears that this is all Judge McCormick did; Sweig did the rest. However long Judge McCormick took to file the opinion as his own, he eventually did so without changing so much as a comma. Harvester can hardly be faulted for its suspicion that Judge McCormick never really examined the evidence offered to prove the alleged fraud.

At the hearing before him on January 22, 1985 (McCormick Transcript, pp. 5, 6, 7–8) and again in his response filed in this court on January 29, 1985 (Reply, p. 4), Judge McCormick states that what occurred here was not unusual. He points out that he frequently asks the attorneys for one side to prepare an appropriate order in a case and that he believes other judges do the same thing. This, of course, is true. Judges do ask lawyers to prepare orders. In those situations, however, everyone knows who is preparing the order and has an opportunity to be heard before it is entered. If Judge McCormick is referring to that kind of situation when he says what happened in this case was routine, he is badly confusing completely different things. The essential difference is that in this case Harvester did not know Sweig wrote the opinions.[7] It is difficult to tell exactly what Judge McCormick is saying. He does not expressly say that he frequently has one side prepare orders or opinions without the knowledge of the other side. Whatever his own practice may be, if he is saying that other judges commonly engage in such a practice, he is simply wrong. It does not happen in the district court nor in any other court in which I have had any experience. If it

happens in the bankruptcy court it should be stopped immediately, and I have no doubt that the judges of this court will take appropriate steps to see that it does.

## REMEDIES

Perhaps the strangest part of this whole matter is the insistence of Judge McCormick and Sweig that Judge McCormick should continue to preside over the adversary proceeding between WSC and Harvester. Their position is that nothing improper has occurred and that there is no reason to believe that Judge McCormick cannot be perfectly impartial.

Harvester's motion to disqualify Judge McCormick is brought pursuant to 28 U.S.C. § 455(a), which provides that a judge shall disqualify himself "in any proceeding in which his impartiality might reasonably be questioned" and 28 U.S.C. § 455(b), which requires disqualification when a judge "has a personal bias or prejudice concerning a party...." In this case, Harvester investigated Judge McCormick and developed evidence that he acted improperly. Harvester then did a natural thing: it moved to disqualify Judge McCormick; it also moved to impound his equipment and supplies, so that further investigation could be made to determine the full extent of the improprieties. Judge McCormick denied both motions, calling the latter "reprehensible." He has also opposed Harvester on this appeal, taking exception to Harvester's allegations of misconduct. All of this has come about without any fault on the part of Harvester, which has been put in the position of having to risk the displeasure of Judge McCormick in order to accomplish his removal from the case.

▪ In these circumstances, there is no doubt that Judge McCormick's impartiality can reasonably be questioned. It may be that notwithstanding all that has occurred,

---

**7.** The other difference is that Sweig prepared a judicial opinion, not a mere order. A judicial opinion is supposed to express the thinking of the judge, and the analysis, emphasis and choice of words are important for that reason. There is no point in a lawyer writing an opinion, because to put words in the mouth of the judge is to defeat the purpose of communicating the judge's independent thoughts. Prior to this case, I had never heard of a lawyer for one of the litigants preparing a judicial opinion. A routine order, on the other hand, can serve its housekeeping function just as well when prepared by a lawyer as by the judge.

he is still totally impartial. But there is no way of knowing that, and this is why the test is not whether it can be proved to a certainty that he is partial, but whether his impartiality can reasonably be questioned. It certainly is not unreasonable for Harvester to question whether Judge McCormick can be impartial toward it during the remainder of this case, and it would be impossibly awkward to require Harvester to continue to litigate before him in the atmosphere that has been created.

Even if the motion to disqualify had not been made, the fact that Sweig was enlisted to write Judge McCormick's opinions without the knowledge of Harvester is itself an indication of bias, at least in a broad sense, in favor of WSC and against Harvester.

Judge McCormick's order denying Harvester's motion for disqualification will be reversed, and Judge McCormick will be disqualified from any further participation in the adversary proceeding or any of the underlying bankruptcy cases.

■ The next question is whether the firm of Nachman, Munitz & Sweig should be disqualified from any further participation in these cases. Unlike judicial disqualification, that matter is not covered by statute. Sweig argues that the decided cases have approved attorney disqualification only in conflict of interest situations. Because there is no allegation of a conflict of interest here, Sweig concludes that disqualification would be inappropriate.

It is true that most reported cases of attorney disqualification have been on the basis of conflict of interest. Neither side has been able to find a case anything like this one on the facts, but there is clear authority for disqualifying an attorney who has been guilty of misconduct other than a conflict of interest. In *Kleiner v. 1st Nat. Bank of Atlanta*, 751 F.2d 1193 (11th Cir. 1985), an attorney for a defendant in a class action, in violation of a court order, secretly solicited exclusion requests from potential members of the plaintiff class. The Court of Appeals for the Eleventh Circuit affirmed an order of the district court fining the attorney $50,000.00 and disqualifying him from further participation in the case. The court referred to the two-part test for attorney disqualification that had been set forth in the Fifth Circuit case of *Woods v. Covington County Bank*, 537 F.2d 804 (5th Cir.1976):

. . . . .

"First, although there need not be proof of actual wrongdoing, 'there must be at least a reasonable possibility that some specifically identifiable impropriety did occur.' Second, 'a court must also find that the likelihood of public suspicion or obloquy outweighs the social interest which will be served by a lawyer's continued participation in a particular case.'"

*United States v. Hobson*, 672 F.2d 825, 828 (11th Cir.1982) (quoting *Woods*, 537 F.2d at 813 & n. 12), *cert. denied*, 459 U.S. 906, 103 S.Ct. 208, 74 L.Ed.2d 166 (1982).

*Kleiner*, 751 F.2d at 1210. The court in *Kleiner* went on to state that:

Once the preceding requirements are satisfied, a court can order disqualification based solely on past improprieties without regard for future taint affecting the outcome of the proceeding.

*Id.*

In a conflict of interest situation, the court is concerned with future taint. But, as *Kleiner* held, future taint is not the only concern. In a case involving only past improprieties, where no repetition is expected, disqualification is still appropriate where "... the likelihood of public suspicion or obloquy outweighs the social interest which will be served by a lawyer's continued participation in a particular case." Applying this test to the case at hand, we are not dealing with "a reasonable possibility" that improprieties occurred; they have been clearly established. To allow Sweig to continue in this case would, in my view, bring the courts and the legal profession into disrepute, for it would amount to condonation of his unethical conduct. I can see no "... social interest

which will be served by [Sweig's] continued participation" in the case. Any hardship to WSC can be minimized by requiring Sweig to pay the fees for the time substitute counsel will need to spend reviewing what has occurred to date. That matter will be discussed later in this opinion.

■ Harvester also asks that the counterclaim be dismissed because of the improper conduct of WSC and its counsel. Harvester's argument is that the suit to set aside the sale of the Wisconsin Steel Division as fraudulent, and to subordinate the liens of Harvester to the claims of other creditors, is essentially an equitable action, requiring that the plaintiff itself be free from inequitable conduct not only before but during the prosecution of the litigation. Harvester suggests that if the court is reluctant to dismiss the counterclaim on the basis of the misconduct already established, discovery should be permitted in order to determine the full extent of the wrongdoing, including the identities of all of the participants. Harvester implies it has reason to believe that personnel of WSC itself, and not just the Sweig firm, were aware that Sweig was writing Judge McCormick's opinions.

Harvester cites authorities which support the well known doctrine that unclean hands can result in a denial of equitable relief. I have no doubt of that proposition, but I do believe a dismissal in this case would be too drastic a remedy, especially in view of the fact that WSC's claim against Harvester probably represents the best hope of any recovery by WSC's multitude of creditors who are not involved in this dispute. The motion to dismiss the counterclaim will be denied. The motion to conduct discovery for the purpose of obtaining additional evidence to support the motion to dismiss is also denied. As indicated below, however, Judge McCormick and Sweig will be required, and presumably can be relied upon, to disclose what other orders and opinions, if any, were written by Nachman, Munitz & Sweig.

■ Turning to the matter of attorney's fees, Harvester moves that Nachman, Munitz & Sweig be required to return to the bankrupt estate all fees it has received in this case, some $450,000.00. Harvester does not explain the rationale for such a sanction, and I think it goes too far. The firm has done a substantial amount of work for the estate and much of it is untainted by the improper conduct involved here. It should not be required to forfeit the reasonable value of the untainted services. Disqualification of the firm from further participation in the case is a sufficient vindication of the public interest in assuring the integrity of the judicial process.[8]

Any petition by Nachman, Munitz & Sweig for additional fees for services already rendered will receive close scrutiny, and I would expect the creditors of WSC to have a keen interest in the matter. Inquiry as to whether payments received thus far by the Nachman firm are in excess of the reasonable value of the services rendered is not necessarily foreclosed either.[9]

A portion of the fees, however, must be returned. Substitute counsel for WSC is going to have to spend considerable time reviewing what has happened to date in order to be able to carry on. This effort is necessary only because Nachman, Munitz & Sweig conducted itself in such a way that it had to be disqualified, and it would

---

8. The question of whether disciplinary action should be taken against Nachman, Munitz & Sweig will be handled by the Executive Committee of this court, just as possible disciplinary action against Judge McCormick would be a matter for the Seventh Circuit Judicial Council. None of the relief granted on motion of Harvester in this case is for the purpose of imposing discipline on either the Sweig firm or Judge McCormick. It is for the purpose of resuscitating the integrity of this proceeding.

9. WSC paid Nachman, Munitz & Sweig a retainer of $275,000.00, before the bankruptcy petition was even filed. This was despite the fact that WSC did not even have sufficient funds on deposit to pay its employees. *See In re Arlan's Department Stores, Inc.,* 615 F.2d 925, 934–36 (2d Cir.1979).

be inequitable to charge the bankrupt estate with the fees that are going to be involved. Accordingly, Nachman, Munitz & Sweig will be ordered to pay the reasonable fees for the time expended by substitute counsel in becoming familiar with the case.

■ Harvester has also moved for an award of its own attorneys' fees for all the time spent in the adversary proceeding. That goes too far, but a partial award of fees is justified. Harvester has had to pay its attorneys to investigate the misconduct of Nachman, Munitz & Sweig and to present and argue the resulting motions to disqualify Sweig and Judge McCormick. This work is entirely unrelated to the merits of the lawsuit and has been directed merely at obtaining an impartial forum, something Harvester was entitled to in the first place. All of the work has been made necessary by Nachman, Munitz & Sweig, which wrote Judge McCormick's opinions, failed to disclose that fact to counsel for Harvester, and has waged a last ditch struggle to keep itself and Judge McCormick in the case when the facts clearly require disqualification of both. Harvester moves for fees pursuant to 28 U.S.C. § 1927, which provides that any attorney ". . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses and attorneys' fees reasonably incurred because of such conduct." Nachman, Munitz & Sweig multiplied these proceedings unreasonably and vexatiously, and they will be required to pay Harvester's reasonable costs, expenses and attorneys' fees incurred as a result of that conduct.

That is not the end of the matter as far as fees are concerned, because it will be necessary to expunge Judge McCormick's orders of November 18, 1982, and January 7, 1985. They are not what they purport to be, and they cannot be allowed to stand. I

intend to withdraw the adversary proceeding from the Bankruptcy Court, as explained below, and I will decide the motion to dismiss and the discovery motion myself. It is not clear whether any additional attorney time will be required in that connection, but whatever time is spent by either the new attorneys for WSC or the attorneys for Harvester will have to be paid for by Nachman, Munitz & Sweig, since it is their misconduct which necessitates the reconsideration. If any orders or opinions in addition to the opinions of November 18, 1982, and January 7, 1985, were written by Sweig without the knowledge of Harvester, they should be identified by Judge McCormick and Sweig, and the same procedure will apply.

## WITHDRAWAL OF THE ADVERSARY PROCEEDING

Harvester has challenged the jurisdiction of the Bankruptcy Court to make dispositive rulings concerning the counterclaim, arguing that the counterclaim raises "non-core" matters as to which, under the new Bankruptcy Act, 28 U.S.C. § 157, final orders can be entered only by a district judge. Harvester had asked Judge McCormick, pursuant to 28 U.S.C. § 157(b)(3) to determine whether this is a core or noncore proceeding, and that motion was fully briefed. No ruling had been made at the time the disqualification question arose.[10]

■ The counterclaim has seven counts, and it appears that at least some of the claims are non-core. For instance, while 28 U.S.C. § 157(b)(2)(C) provides that "counterclaims by the estate against the persons filing claims against the estate" are core proceedings, the counterclaim here joins not simply Harvester, which has made a claim against the estate, but the directors of Harvester, who have not. It would make no sense for a bankruptcy judge to handle the claim of the estate against Harvester while a district judge heard the same claim against the Harvester directors.

---

10. In opposing the motion to produce documents, Harvester argued that the determination as to whether the attorney-client privilege could be penetrated was a "quintessential judicial function" that had to be performed by an Article III judge. The January 7, 1985, opinion does not address that issue.

Fortunately, the statute provides a ready solution for such doubtful situations. Section 157(d) provides that "the district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown." The plain language of this provision permits withdrawal of a core proceeding, and the courts which have addressed the question have so held. *Carlton v. BAWW, Inc.*, 751 F.2d 781, 788 (5th Cir.1985); *In Re White Motor Corp.*, 42 B.R. 693, 701 (N.D.Ohio 1984); *In Re White Farm Equipment Co.*, 42 B.R. 1005, 1021 (N.D.Ohio 1984).

Cause exists for removing this adversary proceeding because the motion to dismiss and the discovery motion have to be reexamined and decided anew. I have spent time reviewing the issues presented by those motions, and it would involve a duplication of time and effort for another bankruptcy judge to start from the beginning. Secondly, there is a substantial question as to whether a bankruptcy judge has authority to make dispositive rulings on these motions anyway, and, on an appeal from a bankruptcy judge's decision on either motion I would have to decide what part of the proceeding is core and what part is non-core. Withdrawal of the entire adversary proceeding eliminates those problems. Finally, two civil cases pending before me, 81 C 7076 and 82 C 6895, are related to the adversary proceeding and should be considered for consolidation with it. These are cases filed by the Pension Benefit Guaranty Corporation against International Harvester, WSC and WSC's parent corporation, Envirodyne Industries, Inc. The PBGC alleges that the sale of the Wisconsin Steel Division by Harvester was a sham and not actually a sale, so that Harvester is still liable as an employer for the unfunded pension fund liabilities that existed at the time WSC filed for reorganization.[11] The two cases are based on similar allegations but involve different pension funds. Harvester has made a motion in this court to consolidate these two cases with the adversary proceeding in the bankruptcy case, but withdrew that motion when the disqualification matter arose. I have not yet fully considered the question of consolidation, but obviously if consolidation is proper that would be another reason for withdrawing the adversary proceeding from the bankruptcy court.

Orders in conformity with this opinion will be entered.

---

11. Harvester takes the position that the sale was *bona fide,* and that liability to the Pension Benefit Guaranty Corporation for unfunded pension benefits is attributable only to the employer maintaining the pension plan on the date of plan termination, which was WSC.