In re COLONY SQUARE COMPANY,
A Georgia Limited Partnership.

No. C84–1109A.

United States District Court,
N.D. Georgia,
Atlanta Division.

May 9, 1986.

Kenneth A. Shapiro, Powell, Goldstein, Frazer & Murphy, Atlanta, Ga., for Colony Square Co.

Thomas R. Johnson, Kirkpatrick, Lockhart, Johnson & Hutchison, Pittsburgh, Pa., for Committee of Holders of Partnership Interests.

Frank M. Bird Jr., Alston & Bird, Atlanta, Ga., for Prudential.

E. Penn Nicholson, Dodd, Driver, Connell & Hughes, Atlanta, Ga., for Committee of Unsecured Creditors.

Myles E. Eastwood, Asst. U.S. Atty., Atlanta, Ga., for U.S.

Robert E. Hicks and Charles E. Campbell, Hicks, Maloof & Campbell, Atlanta, Ga., for Prudential Ins. Co.

Nickolas P. Chilivis, Chilivis & Grindler, Atlanta, Ga., for CSC.

## ORDER

RICHARD C. FREEMAN, District Judge.

This case is before the court on Colony Square Company's ("CSC") amended motion for disqualification and other relief. An evidentiary hearing was conducted by the court with respect to this motion on October 15–19, 1985. The court directed the parties to file post-hearing briefs and took the matter under advisement.[1]

CSC's motion is predicated on the claim that attorneys from Alston & Bird, counsel for Prudential Insurance Company, wrote certain orders which were signed and issued by Bankruptcy Judge Hugh Robinson without the prior knowledge of counsel for CSC. CSC specifically requests that the court grant the following relief:

---

1. CSC has also filed a motion to admit as evidence certain notes taken by Francis M. Bird, Jr., during a phone conversation with Judge Robinson. The notes were located only after the October hearing. CSC's motion to supplement the record is granted.

(1) Vacate and expunge the June 25, 1984 judgment and order of Judge Robinson, granting title to the Colony Square complex to Prudential ("the title order");

(2) Vacate and expunge the April 2, 1985 order and May 7, 1985 judgment of the United States District Court for the Northern District of Georgia, affirming the June 25, 1984 judgment and order of the Bankruptcy Court;

(3) Vacate and expunge the following orders of the Bankruptcy Court:

(i) the September 7, 1984 order denying CSC's motion for order setting briefing schedule, evidentiary hearing, and oral argument;

(ii) the September 7, 1984 order denying CSC's motion for order setting briefing schedule and oral argument;

(iii) the October 29, 1984 order denying CSC's motion for disqualification of Judge Robinson;

(iv) the November 26, 1984 order denying CSC's motion for reconsideration of an October 30, 1984 order, motion to strike affidavit of Grant T. Stein, and request for expedited hearing;

(4) Disqualify Judge Robinson from further participation in any proceedings involving CSC;

(5) Disqualify Alston & Bird from further participation in any proceedings involving CSC;

(6) Instruct the Bankruptcy Court to reconsider *de novo* all of the matters giving rise to an order vacated and expunged by this court;

(7) Award CSC and its counsel their attorneys' fees and expenses incurred in connection with each of the motions giving rise to an order authored by Alston & Bird, appeals therefrom, and this motion for disqualification and other relief.

Prudential requests that the court deny the relief sought by CSC and instead award Prudential its expenses and fees incurred in defending this motion.

## I. Procedural Background

The procedural background leading up to the actions which gave rise to this motion are summarized in this court's order of April 2, 1985, and in the January 10, 1986 opinion of the Eleventh Circuit. *See In re Colony Square Company,* 779 F.2d 653 (11th Cir.1986); *In re Colony Square Company,* Civil Action No. 84–1793A (N.D.Ga. April 2, 1985) (Freeman, J.). On October 16, 1975, CSC filed a voluntary petition under Chapter XII of the Bankruptcy Act of 1898 (formerly 11 U.S.C. § 701 *et seq.*). In an order dated March 30, 1977, Judge Robinson of the United States Bankruptcy Court for the Northern District of Georgia confirmed the Chapter XII Plan for CSC which had been proposed by Prudential, the principal secured creditor of CSC, and consented to by CSC. The Plan provided that CSC would maintain ownership of the Colony Square Complex and that Prudential would lease and manage this property. The Plan also indicated that the Bankruptcy Court for the Northern District of Georgia retained jurisdiction to enforce the Plan and retained exclusive jurisdiction over the property.

CSC subsequently failed to make cash contributions or bring its debt to Prudential current, as required by a Moratorium Agreement entered into concurrently with the lease. Prudential therefore gave CSC notice that it intended to exercise its option under the Agreement to acquire title to the property. January 29, 1982 was set as the date for tender of the debt-cancellation documents.

On January 28, 1982, CSC filed a Chapter 11 case under Title 11, United States Code, as amended by the Bankruptcy Reform Act of 1978, 11 U.S.C. § 101 *et seq.* The Chapter 11 case was filed in the Bankruptcy Court for the Western District of Pennsylvania (the "Pittsburgh bankruptcy court"). The transfer of title to the property from CSC to Prudential did not take place as scheduled.

Prudential moved to dismiss the Chapter 11 case in Pittsburgh. The motion to dismiss was initially denied by the Pittsburgh bankruptcy court. *See In re Colony Square Co.,* 22 B.R. 92 (Bankr.W.D.Pa. 1982). This decision was reversed by the

United States District Court for the Western District of Pennsylvania which, in November 1983, transferred the Chapter 11 case to this court. *Prudential Ins. Co. of America v. Colony Square Co.*, 29 B.R. 432 (W.D.Pa.1983). By order entered February 2, 1984, this court referred the Chapter 11 case to the Bankruptcy Court for the Northern District of Georgia. On March 26, 1984, the bankruptcy court, per Judge Robinson, dismissed the Chapter 11 case. This order, which is not challenged in the instant motion, was affirmed by this court in an order dated June 28, 1985. *In re Colony Square Company*, Civil Action No. 84–1109A (N.D.Ga. June 28, 1985) (Freeman, J.). In an opinion dated May 6, 1986, the Eleventh Circuit affirmed the order of this court. *In re Colony Square Company*, 788 F.2d 739 (11th Cir.1986).

On April 30, 1984, an involuntary Chapter 7 petition was filed against CSC in the Western District of Pennsylvania. CSC converted this action to a Chapter 11 proceeding on June 20, 1984. This matter apparently remains pending in the Pittsburgh court.

On February 9, 1984, Prudential filed a motion in the Atlanta bankruptcy court seeking to compel CSC's compliance with the Chapter XII Plan of reorganization. CSC's response was twofold, asserting first that Prudential had mismanaged the property, and second, that the automatic stay provision of section 362 of the Bankruptcy Reform Act of 1978, 11 U.S.C. § 362, prevented the Atlanta bankruptcy court from proceeding with the Chapter XII case while the second Chapter 11 action was pending in the Pittsburgh bankruptcy court. On May 14, 1984, the Atlanta bankruptcy court issued an order denying CSC's attempt to assert mismanagement and bad faith defenses in connection with Prudential's motion to enforce the plan. This order, which also is not challenged in the instant motion, was appealed to this court. By order dated April 2, 1985, this court affirmed the Bank-

ruptcy Court. The Eleventh Circuit has affirmed the April 2 order of this court. *In re Colony Square Co.*, 779 F.2d at 655.

On June 22, 1984, a final hearing was held by Judge Robinson on Prudential's motion to compel enforcement of the Chapter XII Plan. CSC argued at the hearing that the bankruptcy court and Prudential were enjoined from proceeding with the hearing by virtue of the automatic stay provision of Chapter 11. Judge Robinson indicated that in his opinion, the Atlanta bankruptcy court retained exclusive jurisdiction over the debt involved in the Chapter XII proceeding and that the section 362 stay was therefore inapplicable. *See* Defendant's Exhibit 130 at 40–41.[2]

On June 25, 1984, Judge Robinson entered an order enforcing the Chapter XII Plan. This order, which CSC seeks to vacate and expunge in this motion, was appealed to this court. In the April 2, 1985 order of this court, the court affirmed the June 25, 1984 order of the bankruptcy court. The ruling was appealed to the Eleventh Circuit, which denied CSC's request to stay its decision pending this court's ruling on the instant motion. Instead, the Eleventh Circuit affirmed the April 2, 1985 order of this court, holding that "the stay provision [of section 362] had no effect on Prudential's action to enforce the March 30, 1977 plan, which was commenced under the former Bankruptcy Act of 1898." 779 F.2d at 655. The Eleventh Circuit premised its ruling on the Supreme Court opinion in *Central Trust Co. v. Official Creditors' Committee*, 454 U.S. 354, 102 S.Ct. 695, 70 L.Ed.2d 542 (1982), and on the Atlanta bankruptcy court's express retention of exclusive jurisdiction over the Chapter XII plan, the property, and the parties. The Court of Appeals pointed out that "[t]he affirmance is based on the appropriate reasoning of both the bankruptcy court and the district court." 779 F.2d at 655.

2. After Judge Robinson indicated that he would proceed with the hearing despite the pending Chapter 11 case in Pittsburgh, CSC orally moved for Judge Robinson to recuse himself. Judge Robinson denied this motion from the bench, although he later withdrew this ruling and invited a written motion and briefs.

## II. Factual Background to this Motion

### A. The Title Order

As noted above, Judge Robinson held a final hearing on Prudential's motion to compel compliance with the Chapter XII Plan on Friday morning, June 22, 1984. At approximately 2:00–2:30 that afternoon, Judge Robinson telephoned Francis M. Bird, Jr., lead counsel for Alston & Bird in this litigation. At the time, Bird was in a conference with other Alston & Bird attorneys and Prudential in-house counsel. According to Bird, Judge Robinson indicated that he had decided to rule in Prudential's favor and that, due to the fact that the bankruptcy courts were about to "sunset" or "go out of existence," if Prudential wanted a written order, it would have to prepare and submit one. Bird stated that he was told by Judge Robinson that Judge Robinson had read the brief which CSC filed during the June 22 hearing and that certain points should be covered in the order. No mention was made by either Judge Robinson or Bird regarding notification to CSC.

Bird's recollection of the June 22 conversation with Judge Robinson is consistent with Judge Robinson's interrogatory response regarding this conversation. Judge Robinson stated as follows:

> When I spoke with Frank Bird prior to the entry of the June 25, 1984 order, I told him that Prudential was the prevailing party on its Motion to Enforce Court Order and to Compel Debtor to Carry Out Arrangement. I informed Frank Bird of the factual and legal basis for my decision. In the interest of time, I asked Frank Bird to be a scrivener and to prepare proposed findings of fact and conclusions of law for the court's review. He agreed to my request.

*See* Judge Robinson's Answer to Interrogatory No. 2.[3] According to Judge Robinson, after receiving the proposed order, "[t]he court reviewed the draft, made whatever editorial, factual or legal changes it deemed appropriate and then the court entered the final order as correctly setting forth its findings and conclusions in the matter. The final version was the court's version." *Id.* at No. 3c.

After concluding the discussion with Judge Robinson, Bird excused himself from the conference and prepared an order to be submitted to the judge. The order was delivered to Judge Robinson about 6:00 that afternoon by Grant Stein, an associate with Alston & Bird. At the time that he delivered the order, Stein arranged a hearing with Judge Robinson for 9:30 a.m., Monday, June 25, 1984, for the presentation of an emergency motion.

On June 25, 1984, two hearings were held in different bankruptcy courts. In the Atlanta bankruptcy court, Judge Robinson held a hearing on Prudential's Motion For Issuance of Order in Aid of Jurisdiction. Prudential was represented at this hearing by R. Neal Batson, an Alston & Bird partner. CSC was represented by Jerry Blackstock and Kenneth Shapiro of Powell, Goldstein, Frazer & Murphy. Prior to the hearing, Batson delivered to Judge Robinson a corrected copy of the order which had been submitted to Judge Robinson on June 22, which contained some typographical errors. No mention was made of this order to counsel for CSC during the hearing, either by Judge Robinson or Mr. Batson. Later that afternoon, Judge Robinson called Alston & Bird to have an additional typographical error corrected. A corrected version was delivered to Judge Robinson that afternoon and signed by the judge.

At 8:00 a.m. on June 25, 1984, Judge Cosetti of the Pittsburgh bankruptcy court held a hearing on CSC's Verified Complaint and Motion for Temporary Restraining Order, Preliminary Injunction and Permanent Injunction. CSC was seeking to enjoin Prudential from taking any action against the Colony Square property. CSC was represented by Thomas Johnson of Kirkpatrick & Lockhart; Prudential was represented by Frank Bird. During the course of

---

**3.** By orders dated September 9 and September 17, 1985, this court allowed CSC to undertake limited discovery from Judge Robinson by use of written interrogatories.

the arguments made to Judge Cosetti, Mr. Bird stated as follows:

> Colony is attempting to use this Court to avoid the obligations, to face the Atlanta court. We don't know how Judge Robinson is going to rule. We think we have a good case for getting Prudential's deed. But that's in the breast of that court. But they just don't want to face Judge Robinson.

Plaintiff's Exhibit 3 at 36. Mr. Bird did not reveal his discussion with Judge Robinson to Judge Cosetti or counsel for CSC. In an order dated June 27, 1984, Judge Cosetti denied the motion for a temporary restraining order. In the order, Judge Cosetti expressed his belief that by virtue of the pending Chapter 11 case, section 362 protected CSC's interest in property anywhere. This view, of course, runs counter to the views expressed by the Western District of Pennsylvania, the Atlanta bankruptcy court, this court, and the Eleventh Circuit Court of Appeals. Judge Cosetti also indicated that a sense of comity required that he not engage in a dispute with the Atlanta bankruptcy court.

### B. The September Orders

On August 27 and 28, 1984, six motions were argued before Judge Robinson. On August 29, 1984, Judge Robinson again contacted Frank Bird. Judge Robinson advised Mr. Bird that he had decided to deny three motions filed by CSC and he asked Bird to prepare orders. These motions were CSC's Motion for Stay of the June 25, 1984 Judgment and Order; CSC's Motion for Order Setting Briefing Schedule, Evidentiary Hearing and Oral Argument; and CSC's Motion for Order Setting Briefing Schedule and Oral Argument. Judge Robinson also asked Bird to contact counsel for CSC to inform them of his decisions.

After speaking with Judge Robinson, Bird tried unsuccessfully to reach Jerry Blackstock of Powell, Goldstein. Later that day, however, Bird was able to contact Ken Shapiro, also of Powell, Goldstein.

Bird informed Shapiro of the substance of the discussion with Judge Robinson. Shapiro, in turn, communicated this information to George Cheever of Kirkpatrick & Lockhart, who circulated a memorandum regarding this information to other attorneys at Kirkpatrick & Lockhart who were involved in this litigation. *See* Defendant's Exhibit 192. Bird prepared and submitted the three requested orders to Judge Robinson but did not serve copies of the orders on counsel for CSC. Judge Robinson signed the order denying the motion for a stay on September 4, 1984, and signed the two orders regarding briefing schedules on September 7, 1984. *See* CS–6, CS–7, CS–9.

### C. The Disqualification Order

At the June 22, 1984 hearing in the Atlanta bankruptcy court, Judge Robinson orally denied CSC's motion for recusal. By letter dated June 25, 1984, Judge Robinson withdrew his denial of the motion and invited a written motion. PR–27. On August 31, 1984, CSC filed, pursuant to 28 U.S.C. §§ 144 and 455, a written Motion for Disqualification and Affidavit. The motion was filed with both the Atlanta bankruptcy court and with this court. *See* Defendant's Exhibits 217–220.

Prudential filed a response to CSC's motion for disqualification in both the bankruptcy and district courts. Attached to Prudential's response was an affidavit executed by Frank Bird. Among other things, Bird stated as follows:

> To the extent the second sentence implies *ex parte* contact in reference to the case, affiant denies the same. To the extent the second sentence of paragraph 4b together with the un-numbered paragraph following said paragraph, suggests a relationship tending to create favoritism (in light of the argument at pp. 9–10 of the Brief), affiant denies any such relationship. Affiant's sole contacts with Judge Robinson have been through the judicial process and not social or personal on any occasion; except for the possibility of an

occasional casual encounter in the courthouse, on the street, or at the Southeastern Bankruptcy Law Institute, affiant has had no *ex parte* contact with Judge Robinson, and affiant has sought to consciously avoid any improper contacts or the appearance thereof.

Plaintiff's Exhibit 4.

The motion for disqualification which was filed in the bankruptcy court was argued before Judge Robinson on September 17, 1984. *See* Defendant's Exhibit 147. On or about October 19, 1984, Judge Robinson called Frank Bird, indicated that he had decided to deny the motion for disqualification, and requested that Bird prepare an order. Mr. Bird took notes of the points which Judge Robinson indicated should be covered in the order. *See* Plaintiff's Exhibit 39. Bird assigned the task of drafting the order to Mr. Stein. Stein prepared drafts of an order, using among other sources the notes taken by Bird. The order was submitted to Judge Robinson on or about October 25, 1984, without copies being served on counsel for CSC. Judge Robinson signed the order on October 29, 1984. CS–11. The order was appealed to this court which, by order dated March 12, 1985, affirmed the order of the bankruptcy court. *In Re Colony Square Company*, Civil Action No. 84–2491A (N.D.Ga. March 12, 1985) (Freeman, J.). This court had previously denied the motion for disqualification of Judge Robinson which had been filed in this court. *In Re Colony Square Company*, Civil Action No. 84–1245A (N.D.Ga. Dec. 21, 1984) (Freeman, J.); *In Re Colony Square Company*, Civil Action No. 84–1109A (N.D.Ga. Dec. 27, 1984) (Freeman, J.).

### D. November 26, 1984 Order

By order entered October 30, 1984, the bankruptcy court awarded Prudential attorneys' fees as sanctions against CSC based on a discovery dispute. On November 5, 1984, CSC filed a Motion for Reconsideration of October 30, 1984 Order, Motion to Strike Affidavit of Grant T. Stein, and Request for Expedited Hearing. On or about November 15, 1984, Judge Robinson telephoned Mr. Stein and requested that he prepare and submit an order denying CSC's motion. Stein prepared the order, using his notes from the discussion with Judge Robinson, the pleadings which had been filed in the matter, and his own knowledge of the issues. Transcript, Vol. 2 at 223. The order was submitted to Judge Robinson without a copy being served on counsel for CSC. The order was signed by Judge Robinson on November 26, 1985.

### E. Knowledge and Suspicions of Counsel for CSC

CSC has argued that it did not learn of the conduct which it now challenges until May 20, 1985, when Tom Johnson raised the issue in a telephone conversation with Frank Bird. Prudential contends that the evidence adduced demonstrates that CSC either knew or suspected that Alston & Bird had authored opinions for Judge Robinson long before May 20, 1985.

Prudential points out that in CSC's original motion for disqualification, CSC sought to expunge seven orders entered by Judge Robinson: the five orders challenged in this amended motion plus the September 4 order denying its motion for a stay and an October 30, 1984 order awarding attorneys' fees to Prudential (the quantification order). CSC asserted in its original motion that its attorneys were not advised or aware of the *ex parte* communications leading to these orders or that Alston & Bird had authored them. Discovery undertaken to facilitate an informed ruling on this motion has since shown that CSC's original allegations were inaccurate. As discussed above, it is now clear that on August 29, 1984, Frank Bird informed Ken Shapiro of his August 29 conversation with Judge Robinson in which Judge Robinson indicated that he would rule in Prudential's favor on three motions and requested that Bird submit appropriate orders. Shapiro

communicated this information to George Cheever who reported the information by memorandum to five other Kirkpatrick & Lockhart attorneys.

A careful review of the files of counsel for CSC also revealed that counsel had in fact received from Alston & Bird a copy of the proposed order which Judge Robinson entered on October 30, 1984, awarding sanctions to Prudential. *See* PR–28. Thus, of the seven orders challenged in the original June 6, 1985 motion, counsel for CSC received a copy of one of the orders from Alston & Bird and were notified of Judge Robinson's decision and request that Altston & Bird submit orders with respect to three of the orders. With respect to the five orders which CSC now asks this court to vacate, the evidence demonstrates that with regard to two of these orders, CSC was informed that Judge Robinson had decided to rule in Prudential's favor and had requested the submission of orders from Alston & Bird.

The title order, which was signed by Judge Robinson on June 25, 1984, first became known to CSC counsel on June 26, 1984, when Larry Bogart, a partner at Powell, Goldstein, received the order in the mail. Mr. Bogart testified that he telephoned Tom Johnson in Pittsburgh to inform him of the order. As stated by Bogart, "I told [Johnson] we had received the order, it was bad news, and it was so bad it seemed to me it could have been written by Alston & Bird." Transcript, Volume 3 at 18. Mr. Bogart explained that he wanted to convey to Johnson as succinctly as possible how "bad" the order was but that he did not suspect that the order was actually written by Alston & Bird.

Mr. Bogart subsequently contacted Frank Bird regarding the possibility of obtaining a stay of the June 25, 1984 judgment and order. Bogart contends that he congratulated Bird on the victory and then discussed whether Bird would consent to a stay of the judgment. Mr. Bird presented a very different version of the June 26,

1984 discussion. According to Bird, Bogart stated: "I like your handiwork or I like what you did, or words to that effect." Transcript, Volume 1 at 95. Bird purportedly responded, "Larry you know what the custom and practice has been over there ever since you and I started." *Id.* Bird later explained how he interpreted Bogart's remark:

A. I think [Bogart] was making a statement, I think he was asking a question at the same time. His statement was, I knew you drew this order but I want you to confirm it to me. That is the way I interpret it.

Q. You are not saying he said that, it was your interpretation?

A. Yes, that is what I heard him say.

Q. You didn't hear him say that, in your mind that is what you understood the meaning of what he said, is that correct?

A. That's correct.

Q. Now, why didn't you simply tell him that you had prepared the June 25, 1984 order and get rid of the subject, get it out in the open?

A. As far as I was concerned it was in the open.

*Id.* at 97–98.

Mr. Bogart testified that he could have used the words attributed to him by Bird. Bogart explained, however, that if he had used these words, they did not have the same meaning to him that they might have had to Bird. Bogart went on to suggest that the contrasting interpretations given the June 26 conversation could be based on the fact that Bird actually knew of the origin of the title order whereas Bogart did not possess this knowledge. Bogart denied having any suspicion at the time that Alston & Bird had drafted the title order.

Prudential points out that in terms of appearance, the orders prepared by Alston & Bird were noticeably different from orders prepared in Judge Robinson's chambers. Orders which were prepared in Judge Robinson's chambers and served on

counsel for CSC were on lined paper and, on the bottom left corner, contain the designation "A–O 72–A, Rev. 8/82". In contrast, the orders prepared by Alston & Bird were served on unlined paper and did not contain this designation. When CSC made an initial decision to pursue this matter, Ken Shapiro of Powell, Goldstein visually reviewed orders entered in this case. Shapiro compared the type face, the style of caption, the type of paper, and the writing style. As stated in a memorandum of Tom Johnson, "[Shapiro's] review thoroughly convinces him that Alston & Bird prepared the June 25, 1984 title transfer order." Defendant's Exhibit 207.

The submission of the title order to Judge Robinson without prior notice to opposing counsel was not the first instance in which this type of procedure has been used. Ken Shapiro admitted that approximately a year before the filing of the title order, Judge Robinson had telephoned him regarding a different adversarial proceeding and requested that he submit an order on his client's behalf. Shapiro prepared and submitted the order without providing notice to or serving a copy on his opposing counsel. Judge Robinson made a number of changes to the order and had it retyped before entering it. Shapiro testified that at the time he prepared this order, he did not consider whether his action was improper but that he now believes his conduct was in fact improper.

The testimony presented at the hearing also indicates that Mr. Bogart was not the only Powell, Goldstein attorney to describe Judge Robinson's orders as "so bad they could have been written by Alston & Bird." Ken Shapiro testified that during November or early December 1984, he had a conversation with Jerry Blackstock, the lead litigation partner from Powell, Goldstein during which Blackstock used this description. Shapiro described Blackstock's remark as an "offhand comment." Transcript, Volume 3 at 93. At his deposition, Shapiro was asked what he said, if anything, in response to the remark. At the time, Shapiro answered, "I think I may have said something like, 'maybe so' ". *Id.* at 95. During the hearing, however, Shapiro asserted that his deposition testimony was mere speculation and that it did not occur to him until April 1985 that Alston & Bird might have prepared orders for Judge Robinson. Shapiro also claimed that at the time he had this conversation with Jerry Blackstock, he did not recall that he himself had previously prepared an order for Judge Robinson.

Jerry Blackstock again described Judge Robinson's orders as so bad they could have been prepared by Alston & Bird on December 5, 1984, in Pittsburgh. The statement was apparently made on an elevator in the presence of Shapiro, George Cheever, Tom Johnson, and possibly another CSC attorney. Cheever testified that he took the comment to mean that the preparation of orders by Alston & Bird "was a seriously entertained suspicion." Transcript, Volume 3 at 146.

According to Blackstock, Cheever responded to his comment by saying something like, "Well, you don't think they were, do you?" Blackstock's response to this query was that it was highly unlikely that Alston & Bird had prepared orders but that it would be very difficult to prove in any event. Transcript Vol. 3 at 214, 234–35. Blackstock admitted on cross-examination that his answer at least implied the possibility that Alston & Bird had in fact prepared orders. *Id.* at 236. Blackstock went on to explain, however, that he did not believe at the time that Alston & Bird had prepared orders for Judge Robinson without notifying counsel for CSC. *Id.* at 237.

Although Mr. Blackstock himself may not have believed in December 1984, that Alston & Bird had prepared opinions for Judge Robinson, George Cheever came away from this conversation with the distinct belief that Powell, Goldstein attorneys suspected Alston & Bird of preparing orders. *Id.* at 146. Cheever testified that he gave no further thought to this matter

until he read an article in the March 1985 issue of *American Lawyer* which discussed the decision in *In re Wisconsin Steel*, 48 B.R. 753 (N.D.Ill.1985). On March 29, 1985, Cheever circulated a memorandum among the Kirkpatrick & Lockhart attorneys in which he states: "If my memory serves me well, it was the general sense among our co-counsel at the Powell, Goldstein firm that most if not all of Judge Robinson's opinions handed down in the Colony Square proceedings were in fact authored by lawyers at Alston & Bird." Defendant's Exhibit 203. Cheever reconfirmed during his testimony that he emerged from the conversation with Mr. Blackstock with the belief that it was the general sense among the Powell, Goldstein attorneys that most if not all of Judge Robinson's orders were authored by Alston & Bird. Transcript, Vol. 3 at 171. Cheever nonetheless took no action to pursue the matter at that time, despite the fact that Colony Square's motion for the disqualification of Judge Robinson, which had been filed with this court on August 31, 1984, was still pending. Other Kirkpatrick & Lockhart attorneys testified that they were aware of suspicions that Alston & Bird had prepared orders for Judge Robinson prior to receiving a copy of Cheever's March 29, 1985 memorandum. *See* Finegold Deposition, Defendant's Exhibit 229 at 36; Gespass Deposition, Defendant's Exhibit 230 at 67–68.

F. Alleged *Ex Parte* Contacts by CSC Counsel in the Colony Square Proceedings

Prudential contends that counsel for CSC has also engaged in *ex parte* communications with bankruptcy judges during the course of this litigation. Larry Bogart of Powell, Goldstein testified as follows regarding a meeting he had with Judge Robinson early on in the proceedings:

I don't recall the year, but I do recall that there was a motion to appoint a receiver for Colony Square Company. I called Judge Robinson's office and asked if I could have a meeting with him. Such a meeting was granted, I went to meet with Judge Robinson to inform him that I represented the non-Georgia limited partners and that if the motion to appoint a receiver were brought on for a hearing I would like to have the opportunity to be heard at that time.

Q. Was anyone else present when you met with Judge Robinson?

A. No, sir.

Q. Did anyone else have knowledge with respect to your meeting with Judge Robinson before it took place?

A. I don't think so.

Q. And the purpose of your going to see Judge Robinson was to request that if the court considered the motion for the appointment—was it a receiver or trustee?

A. It was the motion for the appointment of a receiver.

Q. And the purpose of your going to see Judge Robinson was to request him that in the event the court considered that matter to give you an opportunity to be heard?

A. That's correct.

Q. Why didn't you simply file a petition to intervene?

A. I had the feeling that it would be better if the limited partners were not officially parties to that bankruptcy matter.

Q. Well, why was that?

A. I just felt it was better to be as uninvolved with the bankruptcy matter as possible and to keep as low a profile for the limiteds as possible.

The Court: I don't understand. You wanted to keep a low profile, but at the same time you wanted an opportunity to be heard in their behalf?

The Witness: If the matter came on for a hearing, Your Honor, I did want to be heard.

The Court: So you were willing, then, not to be low profile?

The Witness: Yes, sir, if it became necessary at that time.

Transcript, Vol. 3 at 23–25. Significantly, Bogart's testimony indicates that he was merely requesting, albeit in a somewhat secretive manner, an opportunity to be heard rather than discussing the merits of the litigation.

Prudential also asserts that Kirkpatrick & Lockhart has "caused orders to be presented to the Bankruptcy Judge in Pittsburgh in matters opposed by Prudential without Prudential being given a copy of the orders at or prior to the time they were submitted to the Bankruptcy Court." Prudential's Post-hearing Brief at 43. The orders challenged by Prudential are three orders entered by Judge Cosetti which awarded interim compensation to attorneys for the debtor, including Powell, Goldstein, over the objection of Prudential. *See* Defendant's Exhibits 200, 201, 202. Defendant's Exhibit 200 has a copy of George Cheever's business card attached to it. Mr. Cheever testified that he prepared this order and sent them to the Colony Square attorney involved in the fee application. According to Cheever, his purpose was to prepare an order which could be presented at the fee hearing. Cheever testified that he "expected Mr. Turick to show them to counsel for Prudential. And as far as I know, that's exactly what he did." Transcript, Vol. 3 at 188. Cheever could not actually say, however, whether Mr. Turick had shown these orders to Prudential counsel because he had not asked Mr. Turick, although the issue of preparation and service of these orders came up during Mr. Cheever's deposition. *See* Cheever Deposition at 118–131. Mr. Cheever testified that he also prepared the orders submitted as Defendant's Exhibits 201 and 202. Although Cheever could not say how the orders were submitted and whether they were served on counsel for Prudential he testified that a review of the docket and the orders themselves leads to the conclusion that the orders were filed in the clerk's office on December 5, 1984.

Prudential has submitted affidavits of George E. Pierce, Jr., and Michael J. Yurcheshen, co-counsel for Prudential in the bankruptcy proceeding in Pittsburgh. Pierce and Yurcheshen state that prior to the date of signature of the orders, they were not "served with draft copies ... or otherwise notified of said proposed orders, or that the same had been filed with or in any manner offered to the court." Defendant's Exhibits 223 and 224. Yurcheshen further states that "Affiant has examined the originals of said orders in the court's file, and has ascertained from the stamps thereof that said orders were filed on December 5, 1984, bearing a stamp indicating that same was received in chambers of a bankruptcy judge rather than in the office of clerk of said court." Defendant's Exhibit 223 at ¶ 6. CSC responds that it was not required under Bankruptcy Rule 2002 to serve the fee application and that, in any event, it took the position at the hearing that Prudential was not listed as an unsecured creditor and therefore was not entitled to notice. CSC also points out that Prudential had actual knowledge of the fee hearing and was able to obtain a copy of the bankruptcy court docket, on which the fee applications are shown. *See* Transcript, Vol. IV at 21–31.

A review of the evidence and the testimony leads this court to conclude that Defendant's Exhibits 200–202 and the affidavits of Pierce and Yurcheshen add little of value to the issues presented. It is undisputed that Prudential was aware of and actively participated in the fee hearing before Judge Cosetti. Prudential also had access to the bankruptcy court docket. *See* Defendant's Exhibit 160. The proposed orders themselves are little more than form orders which would award the specific amounts requested in the event that Judge Cosetti granted the fee application.

G. The *Wisconsin Steel* Opinion and the Filing of this Motion

A watershed event in terms of the filing of the instant motion occurred on March 6, 1985, when Judge John F. Grady of the

United States District Court for the Northern District of Illinois issued his opinion in *In re Wisconsin Steel Company,* 48 B.R. 753 (N.D.Ill.1985). The *Wisconsin Steel* opinion attracted wide press coverage in legal journals and periodicals and quickly came to the attention of counsel for both parties to this action. Subsequent to learning of *Wisconsin Steel,* CSC counsel took certain actions which culminated in the filing of this motion.

The *Wisconsin Steel* case grew out of the sale of the Wisconsin Steel Works by International Harvester Company to purchasers collectively referred to as WSC. After experiencing financial difficulties, WSC filed for reorganization under Chapter 11 of the Bankruptcy Act. International Harvester filed a proof of claim against the bankrupt estate and WSC filed a counterclaim against International Harvester, alleging fraud in the sale of Wisconsin Steel. Harvester moved to dismiss the counterclaim for failure to state a claim upon which relief could be granted. The parties briefed the motion and the matter was taken under advisement by Bankruptcy Judge Charles B. McCormick. On November 18, 1982, Judge McCormick issued an 11 page opinion denying Harvester's motion to dismiss.

After the parties undertook discovery in the adversary proceeding, a dispute arose over whether Harvester should produce certain communications which Harvester claimed were covered by the attorney-client privilege. The issue was briefed by the parties and taken under advisement by Judge McCormick. On January 7, 1985, Judge McCormick issued an 11 page opinion in which he ordered that the communications be produced.

Harvester's suspicions were subsequently aroused when questions developed over how Nachman, Munitz & Sweig ("Sweig"), counsel for WSC, had knowledge of the discovery order prior to counsel for Harvester. Harvester retained an expert who concluded on the basis of water marks and typewriting analysis that the November 18, 1982 and January 7, 1985 opinions of Judge McCormick were prepared by Sweig. These suspicions were confirmed at a hearing in the bankruptcy court during which Harvester moved to disqualify Judge McCormick and Sweig. Judge McCormick indicated that with regard to the 1985 order, he had asked Sweig to present a proposed order after concluding that he would likely rule in WSC's favor on the motion. Judge McCormick considered the proposed order for approximately six months, during which time he marked-up a copy of the order and had his law clerk draft an order which reached the same conclusion but under a different analysis. Eventually, Judge McCormick signed the order as submitted by Sweig. Judge McCormick denied Harvester's motion for disqualification and an immediate appeal was taken to the district court.

On appeal, Judge Grady concluded that the actions of Judge McCormick and Sweig violated Canon 3A(4) of the Code of Judicial Conduct, Bankruptcy Rule 9003, Disciplinary Rule 7–110(b) of the Illinois Code of Professional Responsibility and Ethical Consideration 7–35 of the Illinois Code of Professional Responsibility. Canon 3A(4) of the Code of Judicial Conduct provides in relevant part: "Judges should accord to every person who is legally interested in a proceeding, or his or her lawyer, full right to be heard according to law, and except as authorized by law, neither initiate nor consider *ex parte* or other communications concerning a pending or impending proceeding." Bankruptcy Rule 9003 contains a similar proscription for attorneys: "Except as otherwise permitted by applicable law, any party in interest and any attorney ... of a party in interest shall refrain from *ex parte* meetings and communications with the bankruptcy judge concerning matters affecting a particular case or proceeding."

Disciplinary Rule 7–110(b) of the Illinois Code of Professional Responsibility is identical to Directory Rule 7–110(B) of the Georgia Code of Professional Responsibility and states as follows:

In an adversary proceeding, a lawyer shall not communicate, or cause another to communicate, as to the merits of the cause with a judge or an official before whom the proceeding is pending, except:

(1) in the course of official proceedings in the cause;

(2) in writing if he promptly delivers a copy of the writing to opposing counsel or to the adverse party if he is not represented by a lawyer;

(3) orally upon adequate notice to opposing counsel or to the adverse party if he is not represented by a lawyer;

(4) as otherwise authorized by law.

Ethical Consideration 7–35 of both the Illinois and Georgia Codes provide:

All litigants and lawyers should have access to tribunals on an equal basis. Generally, in adversary proceedings a lawyer should not communicate with a judge relative to a matter pending before, or which is to be brought before, a tribunal over which he presides in circumstances which might have the effect or give the appearance of granting undue advantage to one party. For example, a lawyer should not communicate with a tribunal by a writing unless a copy thereof is promptly delivered to opposing counsel or to the adverse party if he is not represented by a lawyer. Ordinarily an oral communication by a lawyer with a judge or hearing officer should be made only upon adequate notice to opposing counsel, or, if there is none, to the opposing party. A lawyer should not condone or lend himself to private importunities by another with a judge or hearing officer on behalf of himself or his client.

Judge Grady initially rejected the defense that Judge McCormick had already made up his mind and counsel served merely as scrivener. As pointed out by Judge Grady, only Judge McCormick could actually know whether he was influenced by the proposed order. Judge Grady noted that the ethical rules do not prohibit "prejudical" *ex parte* communications, but *ex parte* communications. Moreover, Judge McCor-

mick's own comments belied his contention that he had already made up his mind and that, accordingly, Harvester was not prejudiced. Judge McCormick made at best a tentative decision to rule in WSC's favor and then carefully considered the proposed order prior to making a final ruling. As pointed out by Judge Grady, had Harvester been given an opportunity to submit a proposed order, Judge McCormick may have ruled in Harvester's favor.

Judge Grady also emphasized the appearance of impropriety created by Judge McCormick's and counsel's actions, an appearance which was compounded by the concealment of these actions. As explained by Judge Grady:

Every experienced lawyer and judge knows how important it is that litigants believe in the fairness of the process. No one likes to lose, but if an unfavorable decision decision is perceived to be the result of an impartial consideration, it is usually bearable. What cannot be tolerated is an unfavorable decision that is seen as not simply wrong, but unfair.

When a judge issues an opinion, it is tangible evidence of the consideration that went into the decision. It provides assurance that an impartial third party analyzed the problem and independently came to a conclusion about the merits of the dispute. But the two opinions in question were not the work of a neutral arbiter. They were the work of Harvester's adversary, the very antithesis of what they purported to be.

48 B.R. at 762.

Judge Grady, in ruling in Harvester's favor on the appeal, granted certain relief, not as a disciplinary matter, but "for the purpose of resuscitating the integrity of [the] proceeding." *Id.* at 765 n. 8. Judge Grady vacated and expunged the orders at issue, stating that "[t]hey are not what they purport to be, and they cannot be allowed to stand." *Id.* at 766. Judge Grady withdrew the adversary proceeding from the bankruptcy court and indicated that he would decide the two motions himself.

Judge Grady also disqualified Judge McCormick from further participation in the adversary proceeding, holding that "Judge McCormick's impartiality can reasonably be questioned." *Id.* at 763. Judge Grady also indicated that "the fact that Sweig was enlisted to write Judge McCormick's opinions without the knowledge of Harvester is itself an indication of bias, at least in a broad sense, in favor of WSC and against Harvester." *Id.* at 764.

Finally, Judge Grady disqualified Sweig from further participation in the case. Judge Grady relied on the two-part test for attorney disqualification first set forth in *Woods v. Covington County Bank*, 537 F.2d 804 (5th Cir.1976), and quoted in *Kleiner v. First National Bank of Atlanta*, 751 F.2d 1193 (11th Cir.1985). Judge Grady also ruled that Nachman, Munitz & Sweig would be required to pay Harvester its attorneys' fees incurred in connection with the motion for disqualification as well as paying the fees for the time expended by substitute counsel for WSC in becoming familiar with the case.

The *Wisconsin Steel* opinion had a galvanizing effect on counsel for CSC, particularly the attorneys at Kirkpatrick & Lockhart. As explained by Mr. Cheever, who believed that the Powell, Goldstein attorneys suspected Alston & Bird of authoring most if not all of Judge Robinson's orders, the case "piqued" his interest in the question of who was preparing Judge Robinson's orders. Transcript, Vol. 3 at 200. Cheever initially pursued the matter by circulating his March 29, 1985 memorandum. Tom Johnson followed up by raising the issue with Powell, Goldstein. On April 5, 1985, Johnson wrote a letter to Ken Shapiro in which he requested that Shapiro "consider with Jerry [Blackstock] and Larry [Bogart] how we might verify that Alston & Bird has ghostwritten orders or opinions for Judge Robinson." Defendant's Exhibit 205.

The Powell, Goldstein attorneys, particularly Jerry Blackstock, apparently were not especially anxious to pursue this matter and little was done other than to discuss the issue. *See* Transcript, Volume 3 at 110–15. On May 15, 1985, Mr. Johnson wrote a second letter to Shapiro, suggesting that he visually compare orders entered in the Colony Square case with Alston & Bird briefs. *See* Defendant's Exhibit 206. Shapiro made a visual comparison of the orders and reported back to Johnson. According to Johnson, "[Shapiro's] review thoroughly convinces him that Alston & Bird prepared the June 25, 1984 title transfer order." Defendant's Exhibit 207. On May 20, 1985, Johnson telephoned Frank Bird to discuss a number of matters with him. During the course of the discussion, Johnson asked Bird if Alston & Bird had prepared the title order. Bird confirmed that Alston & Bird had written the order and Bird and Johnson discussed how this had come about. Johnson asked Bird what other orders Alston & Bird had prepared and Bird mentioned the September orders. Johnson summarized the discussion with Bird in a memorandum which he circulated among the CSC attorneys. Defendant's Exhibit 208. The memorandum does not indicate that Bird was hesitant to reply to Johnson's inquiries or that he sought to conceal Alston & Bird's actions. Johnson and Bird spoke again on May 21, 1984, regarding the issue of ghostwritten orders. Johnson told Bird that he had taken "careful notes of our May 20, 1985 conversation and would like to review them with him to make certain they are accurate." Defendant's Exhibit 209. Johnson then reviewed the previous conversation by paraphrasing a draft affidavit which he was in the process of revising. *Id.* This affidavit formed the basis of the motion for disqualification and other relief filed on June 6, 1985.

### III. Due Process Concerns

The court's determination of whether CSC is entitled to any of the relief which it seeks must be prefaced by consideration of the propriety of the conduct which it challenges. As an initial matter, the court must express its disapproval of the manner in which the orders at issue were entered. The Fifth and Eleventh Circuit Courts of Appeals have repeatedly discouraged a tri-

al court's verbatim adoption of a party's proposed findings of fact and conclusions of law. *See, e.g., Fields v. City of Tarpon Springs, Fla.,* 721 F.2d 318, 320 (11th Cir. 1983); *Keystone Plastics, Inc. v. C & P Plastics, Inc.,* 506 F.2d 960, 962 (5th Cir. 1975). The Supreme Court has also criticized this method of issuing decisions. *Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). The courts have explained that the verbatim adoption of a proposed order submitted by one party presents a number of dangers, including overreaching and exaggeration by an attorney preparing an order with the knowledge that the judge has already decided to rule in that party's favor. *Id.* In addition, a reviewing court is deprived of the assurance that the trial court gave careful attention to the evidence and the arguments presented and reached a decision only after personal analysis.

The instant motion involves a situation which is potentially more serious than the adoption of one party's proposed findings of fact. In the typical situation considered by the appellate courts, a trial court will announce its decision orally and then request the prevailing party to submit a proposed order. Ideally, the losing party will be given the opportunity to comment on the proposal before the order is entered by the court. *See Keystone,* 506 F.2d at 962. While discouraged for the reasons discussed above, this procedure at least carries the safeguard that everyone concerned, including all parties and the reviewing court, are aware of the origin of the court's order.

When a judicial order is entered on the basis of a communication between the judge and the prevailing attorney without any prior notice to the losing side, the dangers discussed above are compounded. The potential for exaggeration and overreaching is heightened when an attorney learns that he has the opportunity to draft an opinion without the knowledge of opposing counsel. The reviewing court is not only deprived of the assurance that the trial court gave appropriate attention to the issues and the evidence, but is misled into

believing that the trial court performed the analysis reflected by the written opinion. The losing party, of course, is unable to bring the authorship of the opinion to the attention of a reviewing court because that party is itself kept in the dark. Finally, as apparently occurred in *Wisconsin Steel,* this procedure presents the possibility that a trial judge will reach merely a tentative decision in favor of one party and then will have this inclination solidified by reviewing the proposed order, without having the opportunity to consider a contrary result.

Despite the potential for abuse presented by the *ex parte* submission of proposed orders, Prudential contends that the manner in which the challenged orders were entered is authorized by law. In support of this argument, Prudential relies on the opinions of this court and of the Fifth Circuit Court of Appeals in *In re Georgia Paneling Supply, Inc.,* 607 F.2d 117 (5th Cir.1979), *vacated* 613 F.2d 137 (5th Cir. 1979), *reinstated* 616 F.2d 893 (5th Cir. 1980). In *Georgia Paneling,* this court denied a motion challenging certain bankruptcy court orders, stating that "[t]he bankruptcy court's failure to request the submission of proposed findings of fact and conclusions of law from all parties was not exemplary but neither was it clearly erroneous." *In re Georgia Paneling Supply, Inc.,* Bankruptcy Case No. 74–1628A (N.D. Ga., Aug. 29, 1978) (Freeman, J.). *See* Defendant's Exhibit 186. The order of this court was appealed to the Fifth Circuit. In the brief filed with the Court of Appeals, the trustee acknowledged drafting proposed orders denying motions filed by the appellant. On appeal, the court noted that the bankruptcy judge was alleged to have engaged in *ex parte* discussions, permitted orders and an opinion to be drafted and typed by appellees or their counsel, and misrepresented the facts regarding this alleged misbehavior. The court of appeals held: "A careful examination of the record, especially those portions cited by appellants, reveals no impropriety. The allegations of misconduct are unfounded." *In re*

*Georgia Paneling Supply Inc.,* 607 F.2d at 118.

*Georgia Paneling* provides at best questionable precedential value in this case. Neither this court nor the Court of Appeals directly addressed the issue of *ex parte* preparation and submission of orders without prior notice. Moreover, *Georgia Paneling* involved a situation in which orders were prepared by the trustee, who is appointed by the bankruptcy court. The preparation of orders by a trustee is significantly different from the adversary proceeding involved in this case. The court is unable to agree with Prudential that the Fifth Circuit opinion in *Georgia Paneling* should be construed as authorizing the *ex parte* entry of orders, particularly in view of the Fifth and Eleventh Circuits' repeated admonitions against the verbatim adoption of findings of fact.

 While the adoption by a trial court of an order prepared by a litigant is clearly not preferred, utilization of this procedure nonetheless does not necessarily deny the losing party due process of law. Due process requires that a litigant be given notice and the opportunity to be heard. *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). *Ex parte* contacts between a judge and a litigant will not always deprive the adversary of these due process attributes. When a party has been given the opportunity to participate actively in a proceeding and is not prejudiced by the *ex parte* contact, the requirements of due process have been met. *See Simer v. Rios,* 661 F.2d 655, 674 (7th Cir. 1981) ("[W]e reject any notion of due process which would place an absolute prohibition on all *ex parte* contacts or proceedings.").

 It is clear that in the instant case, CSC has not been denied its due process rights. CSC was given notice of all hearings before Judge Robinson and was provided the opportunity to set forth its views on the pending motions. A review of the transcripts of these hearings demonstrates that Judge Robinson was an active partici-

pant in the proceedings and was intimately familiar with the issues. *See, e.g.,* Defendants Exhibits 130, 136, 143 and 147. After holding hearings on the issues requiring adjudication, Judge Robinson determined that he would rule in Prudential's favor and then requested that counsel for Prudential draft and submit an appropriate order. In making these requests, Judge Robinson provided counsel with a framework for the particular order to be drafted. Upon receiving a proposed draft of the order, Judge Robinson would review it and make any necessary changes. As stated by Judge Robinson, the final order reflected the thinking of the court. *See* Judge Robinson's Answer to Interrogatory No. 3d. In sum, CSC was given notice of pending issues and an adequate opportunity to present its arguments prior to a decision being made by Judge Robinson. While this court would certainly prefer that the bankruptcy court had drafted its orders without the aid of counsel, the court concludes that the procedure used did not result in a denial of due process.

In addition to the fact that CSC was not denied due process during the course of the proceedings before the bankruptcy court, CSC was also afforded the opportunity for appellate review of the key decisions of the bankruptcy court. The critical issue decided in the title order involved a narrow question of law, i.e., whether the Chapter 11 proceeding in Pittsburgh stayed the Chapter XII proceeding pending before Judge Robinson. Upon receiving an adverse ruling by Judge Robinson on this question, CSC appealed the matter to this court where the issue was briefed and taken under consideration. On April 2, 1985, this court issued an opinion which also rejected the position taken by CSC. Contrary to the intimations of counsel for CSC, this court did not simply act as a rubber stamp for the bankruptcy court. Rather, the April 2, 1985 order reflects the independent consideration and analysis of this court. Of course, CSC then had the opportunity to appeal the decision of this court to the Eleventh Circuit Court of Appeals. On

January 10, 1986, the Court of Appeals affirmed the ruling of this court. The court pointed out that its affirmance was based on the appropriate reasoning of both the bankruptcy court and the district court.

CSC also had the opportunity to appeal the disqualification order to this court. The disqualification order was affirmed by order of this court dated March 12, 1985. This court had previously denied a motion for disqualification of Judge Robinson which had been filed in this court. While the appeal of the disqualification order was pending before this court, counsel for CSC had actual knowledge that Judge Robinson had requested Alston & Bird to prepare at least three orders. In addition, during this time period, Mr. Cheever was under the impression that the Powell, Goldstein attorneys believed Alston & Bird had written most if not all of Judge Robinson's orders. Yet, despite the fact that the appeal of the disqualification order was pending, CSC failed to bring this information to the attention of this court.

CSC has not shown that it was prejudiced by Alston & Bird's preparation of orders for Judge Robinson. CSC has alleged a number of ways in which it was purportedly prejudiced, none of which this court finds persuasive. First, CSC characterizes the proposed orders submitted to Judge Robinson as additional "briefs." As stated by CSC, "[h]ad Colony Square been afforded a similar opportunity, or an opportunity to comment on the proposed opinions, Judge Robinson may have decided another way." CSC's post-hearing brief at 50. As discussed above, however, the evidence produced establishes that Judge Robinson reached his decisions and then requested Alston & Bird to prepare an order which discussed certain specific points. CSC has presented no evidence that Judge Robinson made a tentative decision and then was persuaded by the proposed orders. In view of the evidence presented to this court, CSC's argument on this point is pure sophistry.

CSC next contends that it was deprived of the independent ruling of a neutral tribunal and of a fair adjudication of the issues. The court finds these conclusory contentions an insufficient basis upon which to claim prejudice. CSC also argues that Prudential gained a strategic and tactical advantage by reason of its advance knowledge of Judge Robinson's rulings. CSC's argument is mere speculation unsupported by evidence of actual prejudice.

CSC contends that Judge Cosetti may have ruled differently or faster on the motion presented to him on June 25, 1984 had he been fully informed. This argument is belied by Judge Cosetti's opinion, which expresses a sense of comity regarding the Atlanta bankruptcy court. CSC also asserts that it was unable to refute the statements set forth in Frank Bird's September 7, 1984 Affidavit. In fact, CSC could have refuted Mr. Bird's statement that he had had no *ex parte* contact with Judge Robinson because CSC was aware that on August 29, 1984, Judge Robinson had contacted Mr. Bird and requested that he prepare certain orders.

As a final matter, CSC contends that this court may have ruled differently on the title order had this court been aware that the order was prepared by Alston & Bird. As discussed above, this court affirmed the title order after careful analysis of the law and the opposing arguments. This court believed on April 2, 1985, that the June 25, 1984 order of the bankruptcy court was correct as a matter of law, and this court continues to hold this belief as of this date.

The discussion above reflects the significant factual distinctions between this case and *Wisconsin Steel.* In *Wisconsin Steel,* the bankruptcy judge made at most a tentative decision to rule in favor of one party. As stated by Judge Grady, "There were, after all, only two possible alternatives—to grant the motion or to deny it. To make a tentative choice of one of two alternatives can hardly be called decisive." 48 B.R. at 763. The tentative nature of Judge McCormick's decision is important because his request for the submission of a proposed order provided Wisconsin Steel with an additional opportunity to persuade him. In

contrast, there is no evidence of any hesitancy on the part of Judge Robinson. Judge Robinson did not simply request that Alston & Bird draft proposed orders but rather, he indicated the points he wanted made in these orders. In addition, before making his request to Alston & Bird, Judge Robinson held a number of hearings with respect to the disputed issues, during which he actively questioned the attorneys and discussed his own analysis of the issues. *See, e.g.,* Defendant's Exhibit 130 at 38–48. Judge Robinson promptly entered the orders in question upon receiving and reviewing them. In sum, unlike the situation presented in *Wisconsin Steel*, in this case the Alston & Bird attorneys can fairly be described as "scriveners".

## IV. Relief Requested

### A. Expungement of Orders

CSC seeks to vacate and expunge the challenged orders on the basis of judicial and attorney misconduct. CSC also relies on Rule 60(b) of the Federal Rules of Civil Procedure which allows a court to relieve a party from an order by reason of (3) "fraud ... misrepresentation, or other misconduct of an adverse party"; or (6) "any other reason justifying relief from the operation of the judgment."

■■■ As an initial matter, this court rejects CSC's contention that the challenged orders must be vacated as a matter of law without regard to whether these orders are correct or whether CSC has been prejudiced by the manner in which they were entered. Controlling precedent in this circuit establishes that an order is not void simply because it was prepared by a litigant and signed by the court rather than drafted by the court itself. *See, e.g., Fields v. City of Tarpon Springs, Fla.,* 721 F.2d 318, 320–21 (11th Cir.1983); *Hamm v. Members of Board of Regents of State of*

*Florida,* 708 F.2d 647, 650–51 (11th Cir. 1983); *Kaspar Wire Works, Inc. v. Leco Engineering & Machine, Inc.,* 575 F.2d 530, 543 (5th Cir.1978); *Keystone Plastics, Inc. v. C & P Plastics, Inc.,* 506 F.2d 960, 962–63 (5th Cir.1975). *See, also, United States v. El Paso Co.,* 682 F.2d 530, 540 n. 11 (5th Cir.1982); *Odeco, Inc. v. Avondale Shipyards, Inc.,* 663 F.2d 650, 652–53 (5th Cir. Unit A, 1981). The court recognizes that these cases involve situations in which a trial court adopted proposed findings of fact submitted by a party rather than the *ex parte* submission of a proposed order. More significant, however, than the specific manner in which the challenged order is entered is the issue of whether the trial court adequately performed its role in the decision making process. In this case, as explained in the previous section, the evidence clearly establishes that Judge Robinson did not abdicate his decision making responsibility. Rather, "[t]he record reflects that the trial court fully comprehended the factual and legal issues and adequately performed the 'decision reaching process.'" *Odeco,* 663 F.2d at 653. The challenged orders are orders of the bankruptcy court and are entitled to be reviewed as such.[4]

CSC also has not shown that the challenged orders are erroneous and require expungement for this reason. Particular attention must be given to the title order and the disqualification order. The title order, of course, has been affirmed by this court and by the Eleventh Circuit Court of Appeals. Expunging this order and requiring *de novo* review of the issues adjudicated in the order would be a futile gesture. The disqualification order was previously affirmed by order of this court dated March 12, 1985. This court found then that the October 30, 1984 disqualification order entered by Judge Robinson was not erroneous. Upon further review of this

---

**4.** In this regard, it is important to note that the two critical orders issued by Judge Robinson preceding the title order, the March 26, 1984 order dismissing the first Chapter 11 case and

the May 14, 1984 order severing the mismanagement claim, were both prepared in Judge Robinson's chambers.

order, the court continues to believe that the order is not erroneous.

■ In sum, CSC has not shown either that Judge Robinson abdicated his role in the adjudicative process or that the challenged orders are erroneous. In view of these conclusions, the court also rejects CSC's claim pursuant to Rule 60(b) that misconduct by Alston & Bird attorneys deprived it of a fair adjudication of the issues. CSC's motion to vacate and expunge the orders of the bankruptcy court will therefore be denied. CSC's motion to vacate the April 2, 1985 order of this court will also be denied.

### B. Disqualification of Alston & Bird

CSC moves to disqualify the law firm of Alston & Bird from further participation in these proceedings. CSC relies on the two-part test for disqualification of counsel set forth in *Kleiner v. First National Bank of Atlanta,* 751 F.2d 1193, 1210 (11th Cir. 1985):

> First, although there need not be proof of actual wrongdoing, "there must be at least a reasonable possibility that some specifically identifiable impropriety did occur." Second, "a court must also find that the likelihood of public suspicion or obloquy outweighs the social interest which will be served by a lawyer's continued participation in a particular case." (citations omitted).

Prudential argues that this request is without merit and is in any event untimely.

■ With respect to the first part of the disqualification test, the court finds that attorneys from Alston & Bird acted improperly by not complying with Directory Rule 7–110(B) and Ethical Consideration 7–35 of the Georgia Code of Professional Responsibility. The mandate set forth in these rules is clear: A lawyer should not communicate in writing as to the merits of a cause with a judge unless a copy of the writing is promptly delivered to opposing counsel. It cannot seriously be contended that the submission of a proposed order

ruling on a pending motion is anything other than a written communication as to the merits of a cause. Alston & Bird's failure to serve copies of these proposed orders on opposing counsel was inexplicable.

■ The second part of the disqualification test requires that the court weigh the degree to which the retention of Alston & Bird would erode public trust in the judiciary against Prudential's interest in retaining counsel of choice. *Kleiner,* 751 F.2d at 1210. The court concludes that the extraordinary circumstances presented by this litigation require that Prudential be allowed to continue to retain counsel of its choice. This costly and complex bankruptcy matter is, of course, in its second decade by now. Over the past five years, the litigation has proceeded in the Supreme Court of the United States; the Eleventh Circuit Court of Appeals; the Third Circuit Court of Appeals; the United States District Court for the Northern District of Georgia; the United States District Court for the Western District of Pennsylvania; the United States Bankruptcy Court for the Northern District of Georgia; the United States Bankruptcy Court for the Western District of Pennsylvania; the Superior Court of Fulton County, Georgia; and the Court of Common Pleas of Allegheny County, Pennsylvania. During this time, Prudential has been continuously represented by Alston & Bird or its predecessor firm. The vast majority of the work performed by Alston & Bird is untainted by the more recent improprieties. Disqualification of Alston & Bird at this time would further prolong this already protracted litigation. In the context of these proceedings, disqualification of the firm would be an excessively harsh and drastic measure.

In concluding that Alston & Bird should be allowed to continue as counsel of record, the court has very carefully considered the representations made by Frank Bird to the Pittsburgh bankruptcy court and to this court. As noted above, Mr. Bird submitted

an affidavit to this court in which he stated that he had had no *ex parte* contact with Judge Robinson. *See* Plaintiff's Exhibit 4. Prudential points out that Mr. Bird's affidavit was executed in response to CSC's contentions regarding the development of the Chapter XII Plan. In addition, Mr. Bird explained that he did not consider a request from a judge, who has already made his decision, to an attorney requesting the submission of an order to be an improper *"ex parte"* contact. According to Mr. Bird, consideration must be given to who initiated the conversation, what the conversation was about, and whether the conversation involved an attempt to influence the court. As explained by Mr. Bird, an improper *ex parte* contact "is where an attorney for a party seeks to persuade a judge to make a decision one way or the other in a matter before that judge and outside the presence of the other party." *See* Transcript, Vol. 1 at 108–110. Upon consideration of Mr. Bird's statement in the context in which it was made, as well as in view of the ambiguity regarding whether the submission of a proposed order at the direction of the court constitutes an *ex parte* contact,[5] the court does not impute to Mr. Bird a willful desire to conceal his 1984 discussions with Judge Robinson from this court.

 On June 25, 1984, three days after receiving a request from Judge Robinson to draft the title order, Mr. Bird stated to Judge Cosetti during the course of oral argument, "We don't know how Judge Robinson is going to rule. We think we have a good case for getting Prudential's deed. But that's in the breast of that court." Plaintiff's Exhibit 3 at 36. Although the court finds that this statement was unquestionably misleading, the court concludes that it does not provide grounds for the relief which CSC seeks. While this statement raises questions regarding Mr. Bird's credibility, the credibility of Mr. Bird has not proven to be a determinative factor in this proceeding. CSC has not shown that it incurred any harm as a result of Mr. Bird's misleading statement and the court does not find that Mr. Bird's conduct was so egregious as to require the disqualification of the law firm of Alston & Bird. The court also notes that the statement was made to Judge Cosetti, who of course would not be precluded from taking appropriate disciplinary action against Mr. Bird if he felt that he had been deceived.

## C. Disqualification of Judge Robinson

CSC seeks to disqualify Judge Robinson under 28 U.S.C. § 455. Section 455 provides in relevant part as follows:

(a) Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

(1) Where he has a personal bias or prejudice concerning a party....

A motion to disqualify a judge must be timely filed. *United States v. Slay*, 714 F.2d 1093 (11th Cir.1983); *Delesdernier v. Portierie*, 666 F.2d 116 (5th Cir.1982). A court must consider whether a party acted in a timely manner after learning of the facts which support the motion for disqualification.

 The motion to disqualify Judge Robinson was not timely filed. CSC was informed on August 29, 1984, that Judge Robinson had requested that Alston & Bird prepare three orders. Two days later, CSC filed a motion in this court to disqualify Judge Robinson. In that motion, CSC alleged that Judge Robinson was personally

---

**5.** For example, Black's Law Dictionary (5th ed. 1979) defines *ex parte* as meaning: "On one side only; by or for one party; done for, in behalf of, or on the application of, one party only." The Fifth Circuit has noted that "In its more usual sense, *ex parte* means that an application is made by one party to a proceeding in the absence of the other." *United States v. Meriwether*, 486 F.2d 498, 506 (5th Cir.1973) (quoting Black's Law Dictionary (4th Ed., 1968)).

biased and prejudiced against CSC and its counsel. In the instant motion, CSC argues that Judge Robinson's actions demonstrate *per se* bias against CSC mandating his disqualification. Yet, when CSC filed its August 31, 1984 motion for disqualification, it did not mention that only two days before the filing of the motion, Judge Robinson had requested that Alston & Bird prepare three orders. If CSC believed that the solicitation of orders by Judge Robinson reasonably placed his impartiality in question or demonstrated personal bias or prejudice, CSC should have brought the matter to the attention of the court and obtained a ruling during 1984.

Moreover, as of December 5, 1984, George Cheever was under the impression that the Powell, Goldstein attorneys believed most if not all of Judge Robinson's orders had been written by Alston & Bird. The possibility that Alston & Bird had drafted orders for Judge Robinson appears to have been given at least some thought by Jerry Blackstock and Ken Shapiro of Powell, Goldstein. Despite the fact that CSC's motion to disqualify Judge Robinson was pending before this court from August 31, 1984, until December 21, 1984, CSC made no effort to bring these suspicions to the attention of this court. Apparently only after the *Wisconsin Steel* opinion piqued Mr. Cheever's interest in the issue was any action taken by counsel for CSC. CSC raised the matter of Alston & Bird drafting orders for Judge Robinson before this court for the first time on June 6, 1985.

 Even if the motion to disqualify Judge Robinson was timely, CSC has not met its burden under section 455. As a general rule, bias sufficient to disqualify a judge must stem from extra-judicial sources and must be focused against a party to a proceeding. *Hamm v. Members of Board of Regents of State of Florida,* 708 F.2d 647, 651 (11th Cir.1983). While there is an exception to this rule for judicial conduct exhibiting pervasive bias, rulings adverse to a party will not suffice to consti-

tute pervasive bias. *Id.* This court believes that the solicitation of orders from an attorney neither places a judge's impartiality reasonably in question nor demonstrates *per se* bias or prejudice against the losing party. This is particularly true in this case where this court has already determined that Judge Robinson adequately performed his decision-making responsibility. Indeed, the solicitation of orders by Judge Robinson was not unique to this case. Approximately one year before Judge Robinson requested that Alston & Bird prepare the title order, Judge Robinson requested the preparation of an order in another bankruptcy matter from Ken Shapiro, one of the attorneys for CSC. At the time, it did not occur to Mr. Shapiro that this procedure might be improper. The court also notes that Judge Robinson has stated that he presumed "that counsel for the prevailing party would communicate with a Colony Square attorney regarding any draft which was prepared by counsel for the prevailing party; however I do not know whether counsel for the prevailing party did so." Judge Robinson's Answer to Interrogatory No. 8. Judge Robinson unquestionably should have ensured that counsel for CSC knew that Alston & Bird would be preparing and submitting orders rather than presuming such awareness. Nonetheless, because this court does not believe that Judge Robinson's actions demonstrate personal bias or place his impartiality reasonably in question, the court concludes that CSC has not established grounds for Judge Robinson's disqualification.

### D. Attorneys' Fees

 CSC seeks to recover its attorneys' fees under 28 U.S.C. § 1927 for the time spent in pursuing this motion as well as in connection with the motions which gave rise to an order prepared by Alston & Bird. This request will be denied. Prudential, on the other hand, seeks attorneys' fees under Rule 11, Fed.R.Civ.P., for the defense of

this motion. Prudential contends that the motion was not filed in good faith and that counsel for CSC failed to conduct a reasonable inquiry into the facts or the law relevant to the motion. Although the court agrees that counsel did not inquire into the facts which gave rise to this motion as carefully as they should have, the court will nonetheless deny Prudential's motion. This matter could have been avoided had counsel for Prudential served copies of the proposed orders on counsel for CSC. Prudential and its counsel will be required to bear the costs which they incurred as a result of failing to take this action.

Accordingly, CSC's amended motion for disqualification and other relief is DENIED. Prudential's motion for attorneys' fees pursuant to Rule 11, Fed.R.Civ.P., is also DENIED.